Sharon L. SHANKS, Personal Representative of the Estate of Harvey Hale Rice, Appellant/Cross–Appellee,

v.

The UPJOHN COMPANY, Appellee/Cross–Appellant.

Nos. S–3729, S–3760.

Supreme Court of Alaska.

June 26, 1992.

---

James M. Powell, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, and Joseph S. Slusser, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellant/cross-appellee.

Theodore M. Pease, Jr., Burr, Pease & Kurtz, Anchorage, Richard L. Josephson, Baker & Botts, Houston, Tex., and Earl B. Austin, Baker & Botts, Dallas, Tex., for appellee/cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Shanks represents the estate of a decedent who committed suicide shortly after he began taking a prescription drug manufactured by The Upjohn Company. Shanks sued Upjohn under negligence, negligence *per se*, strict liability design defect, strict liability failure to warn, and breach of warranty theories. On Upjohn's motions for partial summary judgment, the superior court dismissed all but Shanks' strict liability failure to warn claim. At trial, the superior court instructed the jury on negligence principles alone. After a jury verdict for Upjohn and an award of costs and attorney's fees against the estate, Shanks' personal representative appeals. We vacate the award of attorney's fees and reverse and remand for a new trial on the issues of strict liability design defect and failure to warn.

## I. Introduction

On August 29, 1984, Harvey Rice, complaining of back pain, made a visit to his physician, Dr. Richard K. Dobyns. Dr. Dobyns prescribed two drugs, Xanax[1] and Tylenol #3,[2] and advised Mr. Rice to return in two days for a follow-up examination. The doctor warned Mr. Rice, a pilot, that the drugs would cause sedation and that he should not fly, drive or operate machinery.[3] The following evening, after taking the medication, Mr. Rice shot himself in the head following an argument with his wife. He died in the hospital a few hours later. Tests performed on Mr. Rice at the hospital indicated the presence in his system of Xanax, Tylenol, and codeine as well as another CNS depressant, meprobromate.

Sharon L. Shanks, as personal representative of Mr. Rice's estate, sued the Upjohn Company, the manufacturer of Xanax.[4] In her second amended complaint, the operative pleading at the time of trial, Shanks alleged that Mr. Rice's taking of Xanax was the proximate cause of his death. Shanks asserted claims against Upjohn under several theories, including strict products liability, breach of warranty, and negligence. In her strict liability claim, Shanks alleged that Xanax was defective both in its design and in its failure to include adequate warnings. Shanks also alleged that Upjohn was "both strictly liable *per se* and negligent *per se*" based on a failure to warn in violation of AS 17.20.-290(a)(1) of the Alaska Food, Drug and Cosmetic Act. The complaint sought damages for wrongful death and for the decedent's pain and suffering, as well as punitive damages.

Upjohn filed separate motions for partial summary judgment as to all of Shanks' claims. The superior court granted Upjohn's motions dismissing the design de-

---

1. Xanax is the manufacturer's trade name for the drug Alprazolam, a member of the benzodiazepine class of drugs. It is a central nervous system (CNS) depressant used for the treatment of anxiety disorders and anxiety associated with depression.

2. Tylenol #3 is the trade name for acetaminophen with codeine. Codeine is a CNS depressant.

3. Prescription drugs such as Xanax are accompanied by a "package insert" containing warnings and directions for use approved by the United States Food and Drug Administration (FDA). The information contained in the insert, also published in the Physicians' Desk Reference, is intended for the use of the physician, not the patient.

The Xanax package insert warns that because of its CNS effect, patients using Xanax "should be cautioned against engaging in hazardous occupations" and "about the simultaneous ingestion of ... other CNS depressant drugs during treatment with XANAX." In the section of the insert labeled "Precautions" is the following:

As with other psychotropic medications, the usual precautions with respect to administration of the drug and size of the prescription are indicated for severely depressed patients or those in whom there is reason to expect concealed suicidal ideation or plans.

4. The trial court approved a settlement between the Estate and Dr. Dobyns, the hospital, and their insurer. Though originally named as a defendant, the dispensing pharmacy was dismissed by stipulation of the parties.

fect, warranty, negligent failure to warn and the negligence *per se* claims. Thus the strict liability failure to warn claim was the only claim remaining at the time of trial.

During trial, the parties introduced conflicting evidence on the issue of whether Xanax posed a risk of causing suicidal ideation and hostile behavior. Shanks introduced evidence that Upjohn knew of numerous episodes of patients who had exhibited suicidal tendencies or who had committed suicide while undergoing treatment with Xanax, both before and after Mr. Rice's suicide. Upjohn offered expert testimony that Xanax does not cause suicidal ideation and behavior. The parties also introduced conflicting evidence regarding the adequacy of the warnings on the Xanax package insert.

Both parties submitted proposed jury instructions to the superior court. Among those proposed by Shanks were separate instructions on negligence, strict products liability and negligence *per se*. The superior court, over the objections of Shanks' counsel, refused to instruct the jury on strict liability design defect and negligence *per se*. The superior court also rejected Shanks' proposed instructions Nos. 8 and 9 on strict liability failure to warn. Instead, purporting to instruct on the strict liability failure to warn theory, the superior court instructed the jury on negligence principles alone.

The jury returned a verdict for Upjohn. By special verdict, the jury found that Upjohn was not negligent in failing to adequately warn and direct Mr. Rice's physician regarding the effects of Xanax. Based on the verdict, the superior court entered judgment for Upjohn. In its final judgment, the superior court assessed costs and attorney's fees against the estate, refusing to assess them against Mr. Rice's widow and three minor children, as requested by Upjohn. The superior court ordered the estate to pay Upjohn $225,-000.00 in attorney's fees. Shanks' motion for J.N.O.V. or in the alternative for new trial, in which she alleged misconduct by Upjohn's counsel, was denied.

Shanks appeals, challenging the grant of summary judgment and the denial of her motion for new trial. Upjohn cross-appeals, challenging the superior court's refusal to assess costs and fees against the statutory beneficiaries of the estate. The issues on appeal are: 1) whether the superior court erred in its conclusion that prescription drugs are exempt from strict products liability claims alleging a design defect; 2) whether the superior court erred in its jury instructions on Shanks' strict liability failure to warn claim by introducing negligence concepts; 3) whether the superior court committed reversible error in dismissing Shanks' negligence *per se* claims based on the Alaska Food, Drug and Cosmetic Act; and 4) whether the superior court erred in denying Shanks' motion for a new trial based on allegations of attorney misconduct.

## II. Strict Products Liability

### A. Design Defect

■ Shanks' first assignment of error is that the superior court improperly dismissed her strict liability design defect claim on Upjohn's motion for partial summary judgment. Upjohn urges us to adopt a rule of law which would exempt manufacturers of prescription drugs from such claims. Specifically, Upjohn argues that we should adopt the approach of the California Supreme Court in *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988). We decline to do so.

■ A party is entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c). Where, as here, an appeal raises questions of law and policy, this court is not bound by a trial court's resolution of questions of law, but instead is required to adopt the rule of law which is most persuasive in light of precedent, reason and policy. *CTA Architects v. Active Erectors*, 781 P.2d 1364, 1365 (Alaska 1989).

█ It is well established that "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Clary v. Fifth Ave. Chrysler Center*, 454 P.2d 244, 247 (Alaska 1969) (quoting *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 900 (Cal.1962)). A product may be defective because of a manufacturing defect, a defective design, or a failure to contain adequate warnings. *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 878 n. 15 (Alaska 1979).

In *Beck*, we adopted the two-prong defective design test set forth by the California Supreme Court in *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443, 457–58 (1978). *Beck*, 593 P.2d at 886. There we held that the trial court may instruct the jury that a product is defectively designed if:

(1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.

*Id.* (quoting *Barker*, 573 P.2d at 452).

In dismissing Shanks' design defect claim, the superior court relied on the California Supreme Court's opinion in *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal. Rptr. 412, 751 P.2d 470 (1988). Specifically, the superior court relied on that portion of the *Brown* opinion in which the California Supreme Court held that the liability of prescription drug manufacturers for design defects should not be measured by the *Barker* design defect test. *Brown*, 245 Cal.Rptr. at 419–21, 751 P.2d at 477–80. Reasoning that consumers of prescription drugs lack any expectations about the performance safety of the drugs other than those related by the physician, the *Brown* court stated that "the 'consumer expectation' aspect of the [*Barker*] test is inappropriate to prescription drugs." *Id.* 245 Cal. Rptr. at 419, 751 P.2d at 477. While it saw no difficulty with the applicability of the "risk/benefit" prong to prescription drugs, it concluded that to apply the second prong to prescription drugs was violative of the public interest. *Id.* 245 Cal.Rptr. at 419– 21, 751 P.2d at 478–80. In reaching this conclusion, the court cited several rationales, including the unique and important nature of prescription drugs, the cost of insurance and defending against lawsuits, and the effect of the latter in deterring manufacturers from bringing new products to market. *Id.*

The issue of the applicability of the *Barker* test in the context of prescription drugs is before this court for the first time. With respect to the first prong, Shanks argues that the "consumer expectation" prong of the *Barker* test should be consistently applied in all cases, regardless of the nature of the product involved.[5] We disagree.

█ We question the significance of the expectations of the ordinary consumer in determining whether strict liability should be imposed on the manufacturer of the typical prescription drug. Consumers vary widely in their knowledge, sophistication, and ability to understand and evaluate the risks associated with the use of prescription drugs, making it extremely difficult to ascertain the expectations of the "ordinary" consumer. A prescription drug's performance safety depends on many variables, including the nature of the drug itself, the patient's medical history, dosage, and combination with other medications, whose complex interplay is beyond the comprehension of the ordinary consumer. Furthermore, it is doubtful that the average consumer has the information necessary to form a reasonable expectation re

---

**5.** In support of this argument, Shanks cites that portion of the dissent in *Finn v. G.D. Searle & Co.*, 35 Cal.3d 691, 200 Cal.Rptr. 870, 677 P.2d 1147, 1166 (Cal.1987), wherein Chief Justice Bird advocated the blanket application of the "consumer expectation" prong in cases involving prescription drugs.

garding the performance safety of most prescription products, since neither the common law nor the Federal Food Drug and Cosmetic Act require prescription drug manufacturers to provide full warning information directly to the patient/consumer.[6] Under a consumer expectation test, a drug manufacturer might be held strictly liable because the drug performed in a way unexpected by the "ordinary consumer," even though the drug performed in a manner which was well within the expectations of the prescribing physician and the manufacturer. In short, the expectations of the "ordinary consumer," even if ascertainable, are in most cases irrelevant to whether strict liability is to be imposed.

■ However, rather than completely discard an expectation prong, we believe one can be tailored to reflect the unique nature of prescription drugs and the role of the doctor in the decision to use a particular drug. In a sense, prescribing doctors are the consumers of prescription drugs. It is the doctor's evaluation of the patient's condition and consideration of the available treatment alternatives which leads to the choice of a specific prescription drug product. Also, the doctor has ready access to the FDA-approved warning information contained in the package insert and the Physicians' Desk Reference. Thus it is the doctor's expectation, and not that of the patient, regarding the performance and safety of prescription drugs which is the relevant inquiry in the imposition of strict liability. In light of this, we conclude that a prescription drug is defectively designed and strict liability should be imposed on its manufacturer if the prescription drug failed to perform as safely as an ordinary doctor would expect, when used by the patient in an intended and reasonably foreseeable manner.[7]

As to the second prong of the *Barker* test, we find the reasoning of the *Brown* court in declining to apply the "risk/benefit" analysis in the prescription drug context to be unpersuasive, and we decline to follow it. While the social utility and value of prescription drugs as a class of products may exceed that of most other classes of products, we do not believe that this generalization warrants granting "the same protection from liability to those who gave us thalidomide as to the producers of penicillin." 245 Cal.Rptr. at 423, 751 P.2d at 481. Furthermore, we find it speculative at best that restricting strict liability design defect claims against prescription drug manufacturers will serve the public interest by enhancing the availability and affordability of prescription drugs.[8] While we recognize that the threat of products liability litigation in general may impair the ability of drug manufacturers to obtain liability insurance and may cause beneficial drugs to be withdrawn from the market, it is far

---

6. Under the "learned intermediary" rule, a prescription drug manufacturer satisfies the duty to warn if it provides adequate warnings to the prescribing physician. *See, e.g., Polley v. Ciba–Geigy Corp.*, 658 F.Supp. 420, 422–23 (D.Alaska 1987).

 Section 503 of the Federal Food Drug and Cosmetics Act exempts drugs dispensed on a prescription from the rigorous labeling requirements of section 502 of the act. *See* 21 U.S.C.S. §§ 352, 353(b)(2) (1984).

7. With certain types of prescription drugs, the role of the doctor in the decision to use a specific product is significantly reduced. Examples of such atypical prescription products include contraceptives, where the patient initiates and directs the usage, drugs typically administered in a clinical setting with little or no physician involvement, or drugs marketed under a strategy designed to appeal directly to the consuming public. These are areas where courts have held that manufacturers have a duty to warn patients directly. *See infra* note 17. In

strict liability design defect cases involving such products, it may be appropriate to apply the "ordinary consumer expectation" test rather than the "ordinary doctor expectation" test.

8. The *Brown* court states that "[w]e are aware of only one decision that has applied the doctrine of strict liability to prescription drugs." *Id.* 245 Cal.Rptr. at 418, 751 P.2d at 476 (citing *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 654–57 (1st Cir.1981)). Yet the court goes on to discuss the adverse effect of products liability litigation on the availability and cost of prescription drugs. *Id.* 245 Cal.Rptr. at 421, 751 P.2d at 479–80. If, as the *Brown* court claims, theories other than strict liability have been the basis of recovery under these claims in the past, it is unclear how limiting strict liability causes of action will serve the policy interest in enhancing the availability and affordability of prescription drugs in the future.

from obvious that strict liability doctrines, rather than the awards of compensatory and punitive damages in negligence actions, are responsible. Products liability suits against drug manufacturers are almost invariably brought under both negligence and strict liability theories. *See* McClellan, *Strict Liability for Drug Induced Injuries: An Excursion Through the Maze of Products Liability, Negligence and Absolute Liability*, 25 Wayne L.Rev. 1, 1 (1978). There is nothing in the record of this case to indicate, nor does the *Brown* court explain, the impact of design defect claims alone on the cost of products liability litigation, on the cost to drug manufacturers of liability insurance or on the availability and affordability of prescription drugs. Finally, we find it consistent with the purposes underlying strict products liability that manufacturers should be deterred from marketing certain products and that the cost of the defense of strict products liability litigation and any resulting judgments should be borne by the manufacturer who is able to spread the cost through insurance and by charging more for its products. *See* 245 Cal.Rptr. at 420, 751 P.2d at 478.

We find the language of the Eighth Circuit Court of Appeals, explicitly rejecting the policy basis of the *Brown* decision in *Hill v. Searle Laboratories*, 884 F.2d 1064, 1069 (8th Cir.1989), to be particularly apt. There the court stated that

> the premise generally relied on by those courts [exempting all prescription drugs from strict liability design defect claims]—that the public interest in the development of prescription drug products requires the user to bear all the costs of injury unless the drug product was negligently manufactured or designed or unaccompanied by proper warnings—is unconvincing. In our view,

this policy has no greater relevance to prescription drug products than to other products having life-saving or life-bettering characteristics.

*Id.* The public policy concerns underlying the doctrine of strict products liability [9] must be balanced with, rather than yield to, the public interest in the availability and affordability of safe prescription drugs. We believe that these interests are best balanced and served by applying the risk/benefit prong of the *Barker* test in determining the liability of prescription drug manufacturers. We hold that the superior court erred in not doing so.

 In deciding whether a defendant has met the burden of proving that the benefits of the design outweigh the risk, we stated in *Beck* that the fact finder must consider competing factors, including but not limited to

> the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

593 P.2d at 886 (quoting *Barker*, 573 P.2d at 455). We believe these factors, with some modification and additions, should be considered in making the same determination in cases involving prescription drugs. Rephrasing these factors in language more appropriate to prescription drug products, the fact finder should consider the seriousness of the side effects or reactions posed by the drug, the likelihood that such side effects or reactions would occur, the feasibility of an alternative design which would eliminate or reduce the side effects or reactions without affecting the efficacy of the drug, and the harm to the consumer

---

9. In *Beck* we stated the policy reasons for imposing strict liability:

> [t]he purpose of imposing such strict liability on the manufacturer and retailer is to insure that the cost of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.

593 P.2d at 878 (quoting *Clary v. Fifth Ave. Chrysler Center*, 454 P.2d 244, 248 (Alaska 1969)). We went on to observe that

> one of the major goals of strict products liability is to relieve the plaintiff of the burdensome evidentiary requirements of the negligence cause of action. . . .

593 P.2d at 882.

in terms of reduced efficacy and any new side effects or reactions that would result from an alternative design. In evaluating the benefits, the fact finder should be permitted to consider the seriousness of the condition for which the drug is indicated. In summary, what the trier of fact should determine in balancing these factors is whether the drug confers an important benefit and whether the interest in its availability outweighs the interest in promoting the enhanced accountability which strict products liability design defect review provides. *See Kearl v. Lederle Laboratories*, 172 Cal.App.3d 812, 218 Cal. Rptr. 453, 464 (1985).[10]

On appeal, the parties extensively briefed the issue of the applicability and scope of comment k to § 402A of the Restatement (Second) of Torts.[11] Most courts that have considered the issue have adopted comment k to § 402A.[12] *See*

*Brown*, 245 Cal.Rptr. at 417, 751 P.2d at 476. Upjohn now urges us to adopt comment k and follow the *Brown* court in interpreting it to grant immunity from strict liability design defect claims to manufacturers of all prescription drugs. *Id.* 245 Cal.Rptr. at 422–24, 571 P.2d at 481–83.

While we accept the soundness of the policy underlying comment k that manufacturers of certain highly beneficial products which have inherent unavoidable risks of which the user is adequately warned should not be held strictly liable for injuries resulting from their products, we decline to formally adopt comment k for three reasons. First, we believe that comment k has contributed to the confusion which permeates this area of law and blurs the distinctions between negligence and strict liability principles, a distinction we believe warrants preservation.[13]

---

**10.** We reject Upjohn's argument that courts should defer to the determination of the Food and Drug Administration as to the safety and efficacy of a prescription drug. While a deferential standard of review is appropriate when directly reviewing an agency decision, *see, e.g., Pan American Petroleum Corp. v. Shell Oil Co.*, 455 P.2d 12, 20–23 (Alaska 1969), we feel that such deference in the face of allegations of serious injuries caused by FDA-approved drugs would amount to an abdication of judicial responsibility. *See Grundberg v. Upjohn Co.*, 813 P.2d 89, 100–04 (Utah 1991) (Stewart, J., dissenting).

**11.** Section 402A sets out the rule of strict products liability. Restatement (Second) of Torts § 402A (1965). Alaska's rule of strict liability is essentially a modified version of the rule. Alaska rejects the requirement of § 402A that a plaintiff must prove the product at issue is "unreasonably dangerous." *See Butaud v. Suburban Marine & Sporting Goods, Inc.*, 543 P.2d 209, 213–14 (Alaska 1975) (following *Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972)).

**12.** Comment k to § 402A provides:

*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified,

notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
Restatement (Second) of Torts § 402A cmt. k (1965).

**13.** The *Brown* court recognized this confusion when it stated that

[c]omment k has been analyzed and criticized by numerous commentators. While there is some disagreement as to its scope and meaning, there is a general consensus that, although it purports to explain the strict liability doctrine, in fact the principle it states is based on negligence.

Secondly, courts are unable to agree as to the comment's scope. Some courts have interpreted comment k to exempt all prescription drugs from strict liability design defect claims. *See, e.g., Brown,* 245 Cal. Rptr. at 415–24, 751 P.2d at 473–83. In *Grundberg v. Upjohn Co.,* 813 P.2d 89 (Utah 1991), the most recent case addressing this issue, the Utah Supreme Court arrived at the same conclusion but refused to rely on a strained interpretation of the plain language of comment k to reach this result. *Id.* at 95. Other courts, without confronting the issue squarely, discuss comment k as if it applies to all prescription drugs. *See, e.g., Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87, 90 (2d Cir.1980); *McKee v. Moore,* 648 P.2d 21, 24 (Okla.1982); *Terhune v. A.H. Robbins Co.,* 90 Wash.2d 9, 577 P.2d 975, 977–78 (1978). Still other courts interpret comment k to provide the exemption only to those prescription drugs determined on a case-by-case basis to be "unavoidably dangerous." *See, e.g., Hill v. Searle Laboratories,* 884 F.2d 1064, 1068 (8th Cir.1989); *Amore v. G.D. Searle & Co.,* 748 F.Supp. 845, 853 (S.D.Fla.1990); *West v. Searle & Co.,* 305 Ark. 33, 806 S.W.2d 608, 612 (1991); *Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297, 308 (1987); *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 795 P.2d 915, 924–26 (1990); *Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775, 779–81 (R.I.1988). By declining to adopt comment k, we hope to avoid contributing to this confusion.

Finally, we believe that the risk/benefit prong of the *Barker* test offers the manufacturers of those products intended to be protected by comment k an opportunity to avoid liability for strict liability claims based on a design defect theory. For these reasons, we find it undesirable and unnecessary to impose the additional layer of comment k on an area of law which is already strained under its own doctrinal weight. We recognize that by holding that

the liability of drug manufacturers should be measured by the second prong of the *Barker* test, we are taking a position similar to those jurisdictions which apply comment k to prescription drugs on a case-by-case basis. However, we arrive at this result without specifically relying on comment k.

■ In summary, the superior court erred in its conclusion that prescription drugs are exempt from strict liability design defect claims. Alaska recognizes such claims and makes no exception for prescription drugs. Neither policy nor reason supports the approach taken by some courts in barring such claims. We believe the "ordinary doctor expectation" test we adopt today is a workable adaptation of the first prong of the *Barker* test which sufficiently takes into account the special character of prescription drug products. Although we need not reach the issues of the applicability or interpretation of comment k to § 402A of the Restatement (Second) of Torts, we note that the policy underlying comment k is fostered in the application of the second prong of the *Barker* test in design defect strict liability cases involving prescription drugs. Because issues of material fact exist as to whether Rice used Xanax in an intended or reasonably foreseeable manner, whether the drug performed as safely as an ordinary doctor would expect, whether the design of Xanax proximately caused Rice's injury, and whether the benefits of the drug outweigh any risks inherent in its design, this case must be remanded to the superior court for resolution of these issues.

## B. Failure to Warn

■ While it dismissed all but Shanks' strict liability failure to warn claim before trial, the superior court's jury instructions presented only a negligence theory to the jury.[14] Shanks argues that the superior

---

*Brown,* 245 Cal.Rptr. at 417, 751 P.2d at 475.

**14.** The trial court's jury instruction No. 19 read:
The plaintiff's theory of recovery is that the plaintiff's loss was caused by the negligence of Upjohn in failing to give adequate warnings

and directions about XANAX. In order for plaintiff to win, you must find by a preponderance of the evidence each of the following:
1. That the drug XANAX had certain effects that were a legal cause of the decedent's conduct which led to his death;

court erred when it introduced negligence principles while instructing the jury on the strict liability failure to warn claim. Upjohn argues that the superior court was correct in applying only negligence principles in instructing the jury on this claim.

We recognize the conceptual problems that exist in determining the boundary between negligent and strict liability failure to warn and the practical difficulties facing courts and juries in applying these principles. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 99, at 697–98 (5th ed. 1984). *See also* Allan E. Korpela, *Failure to Warn as Basis of Liability Under Doctrine of Strict Liability in Tort*, 53 A.L.R.3d 239 (1973); Henderson & Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn*, 65 N.Y.U.L.Rev. 265, 273–74 (1990). Negligence-like language inevitably creeps into strict liability failure to warn analysis,[15] both in the context of determining which risks require a warning and in determining whether a warning is adequate. However, we believe that the policy underlying strict liability warrants preserving the distinction between the doctrines.

Shortly after adopting the rule of strict products liability, we stated that

the focus of attention in strict liability cases is not on the conduct of the defendant, but rather on the existence of the defective product which causes injuries. Liability is attached, as a matter of policy, on the basis of the existence of a

defect rather than on the basis of the defendant's negligent conduct.

*Bachner v. Pearson*, 479 P.2d 319, 329 (Alaska 1970). We later held that it is reversible error to instruct the jury by focusing on negligence concepts in strict liability failure to warn cases. *See Patricia R. v. Sullivan*, 631 P.2d 91, 102 (Alaska 1981). In *Patricia R. v. Sullivan*, we disapproved of the trial court's jury instruction

because it focuses on such negligence concepts and issues as whether the manufacturer had reason to know of the hazard involved in the use of the product, [and] the manufacturer's duty to use reasonable care in giving a warning....

We are in accord with those authorities which hold that in strict liability cases the need for and the sufficiency of a warning should be expressed without reference to negligence principles.

*Id.* at 102.

■ In the present case, the jury instructions were defective in two respects. First, instruction Nos. 19 & 20 expressly present Shanks' strict liability failure to warn claim to the jury as a negligence claim in contravention of our holding in *Patricia R.* Secondly, instruction No. 19 impermissibly placed on Shanks the burden of showing that the risks inherent in Xanax were risks which Upjohn knew or should have known of at the time of Rice's death. Under a strict liability failure to warn theory, if the plaintiff proves that the product as marketed posed a risk of injury to one

---

2. That Upjohn knew, or it was reasonably scientifically knowable, that XANAX would have those effects;
3. That Upjohn negligently failed to adequately warn and direct Dr. Dobyns concerning those effects;
4. That Harvey Rice's estate suffered an actual loss; and
5. That Upjohn's negligence was a legal cause of the loss to the estate of the decedent.
These are the essential elements of plaintiff's claim. All five must be established by a preponderance of the evidence for plaintiff to win; if one or more of these elements are not established, you must find for Upjohn.
I will define "negligence" and "legal cause" for you in a moment.
The trial court's jury instruction No. 20 read:

I will now define negligence for you. Negligence is the failure to use reasonable care. Reasonable care is that amount of care that a reasonably prudent person would use under similar circumstances. Negligence may consist of doing something which a reasonably prudent person would not do, or it may consist of failing to do something which a reasonably prudent person would do. A reasonably prudent person is not the exceptionally cautious or skillful individual, but a person of reasonable and ordinary carefulness.
In this case, you must decide whether Harvey Rice, Kathy Rice and Upjohn used reasonable care under the circumstances.

15. *See Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033, 1039 (1974).

who uses the product in a reasonably foreseeable manner and the product is marketed without adequate warnings of the risk, the product is defective. *See Prince v. Parachutes, Inc.*, 685 P.2d 83, 88 (Alaska 1984). If such a defect is the proximate cause of the plaintiff's injuries, the manufacturer is strictly liable unless the defendant manufacturer can prove that the risk was scientifically unknowable at the time the product was distributed to the plaintiff. *See Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059, 1063–64 (Alaska 1979); *see also Caterpillar Tractor Co. v. Beck*, 624 P.2d 790, 792 (Alaska 1981). The superior court committed reversible error in only presenting a negligent failure to warn theory to the jury and in depriving Shanks of her strict liability failure to warn claim.

Shanks does not directly challenge instruction No. 21 defining "adequate warnings and directions." [16] Nonetheless, to guide the superior court on retrial on the issue of strict liability failure to warn, we will briefly address the sufficiency of this instruction.

In most cases, for a warning to be adequate, it should: 1) clearly indicate the scope of the risk or danger posed by the product; 2) reasonably communicate the extent or seriousness of harm that could result from the risk or danger; and 3) be conveyed in such a manner as to alert the reasonably prudent person. *See First National Bank of Albuquerque v. Nor-Am Agricultural Products, Inc.*, 88 N.M. 74, 537 P.2d 682, 691–93 (1975). In the case of prescription drugs, the warnings should be sufficient to put the physician on notice of the nature and extent of any scientifically knowable risks or dangers inherent in the use of the drug. *See Polley v. Ciba–Geigy Corp.*, 658 F.Supp. 420 (D.Alaska 1987). As strict liability may also be predicated on the inadequacy of the directions or instructions for the safe use of the product, *see Gosewisch v. American Honda Motor Co.*, 153 Ariz. 400, 737 P.2d 376 (1987), the focus in instruction No. 21 on the adequacy of both the warning and the directions was proper. In determining the adequacy of the warnings and directions in the context of typical prescription drugs, it is appropriate for the trier of fact to consider that the warnings and directions were directed to the prescribing physician rather than to the patient.[17] However, in an instruction on the adequacy of warnings or directions under a strict liability theory, courts should avoid focusing on the negligence concepts and issues found objectionable in *Patricia R.* *See Patricia R.*, 631 P.2d at 101–102.

### III. Negligence *Per Se*

Shanks also assigns error to the superior court's refusal to instruct the jury on her

---

**16.** Instruction No. 21 reads:

"Adequate warnings and directions" are verbal or written warnings and directions that, under the circumstances then existing, provide a doctor with reasonable notice of the intended effects, side effects, and adverse effects of a drug and clear directions for the safe use of the drug. In judging the reasonableness of the notice and the clarity of the directions, the jury should consider that the notice and directions were directed to a health care professional.

A drug manufacturer is required to give adequate warnings and directions concerning all effects of the drug and all aspects of its use, but only if those effects and aspects are known or reasonably scientifically knowable to the manufacturer. The manufacturer cannot be held liable if it has provided adequate warnings and directions to the doctor and the doctor does not follow them.

**17.** *See Polley v. Ciba–Geigy Corp.*, 658 F.Supp. 420 (D.Alaska 1987) stating in pertinent part:

Every single court which has considered the issue in the context of prescription medicines—except for oral contraceptives or mass immunization, situations in which the physician's traditional role as a learned intermediary is minimized—has concluded that there is no duty on the part of the manufacturer to warn the patient directly of risks inherent in the prescription medicine.

*Id.* at 422–23. *See also Hill v. Searle Laboratories*, 884 F.2d 1064, 1070–71 (8th Cir.1989); *Plummer v. Lederle Laboratories*, 819 F.2d 349, 356–57 (2d Cir.1987). While warnings to both the prescribing physician and the patient directly would further both the interest in safe drug use and the ability of patients to make informed decisions regarding their health care, the law does not recognize such a duty except in the limited situations mentioned in *Polley*. Because these exceptions do not apply here, any of Shanks' claims or arguments predicated on a duty of a drug manufacturer to warn the consumer directly must be rejected.

negligence *per se* and "strict liability *per se*" claims under AS 17.20.290(a)(1) and AS 17.20.090(6).[18]

In *Ferrell v. Baxter*, 484 P.2d 250 (Alaska 1971), we adopted the doctrine of negligence *per se* as set forth in the Restatement (Second) of Torts §§ 286, 288A, and 288B (1965). Under the doctrine, a court may adopt as the standard of conduct of a reasonable person the requirements of a statute whose purpose is to protect the class of persons to which the plaintiff belongs, to protect the particular interest invaded, to protect that interest against the kind of harm which resulted, and to protect that interest against the particular hazard from which the harm results, and that the unexcused violation of such a statute is negligence in itself. *Ferrell*, 484 P.2d at 263–64. In determining whether to give a negligence *per se* instruction, the trial court must first "determine whether the conduct at issue lies within the ambit of the statute or regulation in question, by applying the four criteria set out in the Restatement (Second) of Torts § 286 (1965)." *State Mechanical, Inc. v. Liquid Air, Inc.*, 665 P.2d 15, 18 (Alaska 1983) (footnote omitted). If the trial court concludes that the statute is applicable, the court has the limited discretion to refuse to give the negligence *per se* instruction only if it determines that "the rule of law is so obscure, unknown, outdated, or arbitrary as to make inequitable its adoption as a standard of reasonable care," *State Mechanical, Inc.*, 665 P.2d at 19, or where a statute is too vague or arcane to be used as a reasonable standard of care,

or amounts to little more than a duplication of the common law tort duty to act reasonably under the circumstances. *Harned v. Dura Corp.*, 665 P.2d 5, 12 (Alaska 1983). Such a determination will only be reversed on appeal if it constitutes an abuse of discretion. *Id.*

We cannot say that the superior court abused its discretion. The language of these statutes merely prohibits the manufacture or sale of drugs without adequate warnings, therefore adding little to the common law duty to adequately warn. Also, the statutes are vague as to their requirements in the context of prescription drugs. Because the standard for determining the adequacy of a warning may differ depending on whether the warning is directed to the medical community as with prescription drugs or to the public in the case of over-the-counter drugs, there is the potential for confusion in using these statutes to define the standard of care in both contexts.[19]

The superior court submitted the negligent failure to warn issue to the jury, which found no negligence on the part of Upjohn. Thus we see no reason to remand on the negligence issue.

## IV. Attorney Misconduct

On appeal, Shanks contends that the misconduct of counsel for Upjohn deprived Shanks of a fair trial.[20] Though not stated as such, this is essentially a challenge to the superior court's denial of Shanks' motion for new trial.

---

**18.** AS 17.20.290(a)(1) of the Alaska Food, Drug and Cosmetic Act prohibits the manufacture or sale of misbranded drugs. AS 17.20.090(6) states that a drug is misbranded unless its labeling bears adequate directions and adequate warnings.

**19.** Shanks argues that our opinion in *Ross Laboratories v. Thies*, 725 P.2d 1076 (Alaska 1986), is dispositive of the issue. There, we affirmed a ruling that the manufacturer of a liquid glucose product was negligent *per se* for failing to include a warning in violation of AS 17.20.-290(a)(1) and AS 17.20.090(6). We declared that the Food, Drug and Cosmetic Act

was clearly designed to protect consumers of drugs from unappreciated dangers and thus it

properly may form the basis for civil liability in tort.

*Id.* at 1079–80. However, *Thies* is distinguishable in that the product there was available "over-the-counter" without a prescription. *Id.* at 1078.

**20.** Shanks contends that Upjohn's counsel engaged in attorney misconduct by referring during opening arguments to two documents, which were ultimately not admitted into evidence and by contacting a person identified in documents filed with the court as an expert witness for Shanks, but whom Shanks had not yet retained as an expert at the time of the contact.

The denial of a motion for new trial rests in the sound discretion of the trial court and this court will not disturb the trial court's decision except in exceptional circumstances to prevent a miscarriage of justice. *Buoy v. ERA Helicopters, Inc.*, 771 P.2d 439, 442 (Alaska 1989). We conclude that the grounds asserted by Shanks in her motion for new trial did not amount to attorney misconduct, nor did the superior court's decision to deny the motion result in a miscarriage of justice.

## V. Conclusion

The superior court erred in dismissing Shanks' strict liability design defect claim. The superior court also erred in failing to present Shanks' strict liability failure to warn claim to the jury. However, it acted properly in declining to instruct the jury on Shanks' negligence *per se* claim and in denying her motion for new trial based on attorney misconduct.

The judgment of the superior court is REVERSED and REMANDED for further proceedings consistent with this opinion. The award of attorney's fees is VACATED.