(No. 89043.—

STEVEN HANSEN, Special Adm'r of the Estate of
Andrina Hansen, Appellee, v. BAXTER HEALTH-
CARE CORPORATION, Appellant.

*Opinion filed January 25, 2002.*

William R. Quinlan, Gino L. DiVito, Michael I. Rothstein, David M. Jenkins and Brian J. Alesia, of Quinlan & Crisham, Ltd., of Chicago (Charles R. Purcell, of counsel), for appellant.

Kevin M. Forde, Janice R. Forde and Kevin R. Malloy, of Kevin M. Forde, Ltd., Paul B. Episcope, John C. Erb and David S. Jasmer, of the Law Offices of Paul B. Episcope, Ltd., and John Rokacz, all of Chicago, for appellee.

Jay H. Tressler, of Tressler, Soderstrom, Maloney & Priess, of Chicago, Robert N. Weiner, of Arnold & Porter, of Washington, D.C., and Hugh F. Young, Jr., of Reston, Virginia, for *amicus curiae* Product Liability Advisory Council.

James Paul Costello, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE KILBRIDE delivered the opinion of the court:

Plaintiff's decedent, Andrina Hansen, suffered an air embolism because an intravenous (IV) tube became detached from a catheter inserted into her jugular vein. The embolism caused brain damage and paralysis; Andrina died a little more than four years later.

The administrator of Andrina's estate filed medical malpractice claims, in the circuit court of Cook County, against the hospital and one of her treating nurses. He later added survival and wrongful-death claims based on a products liability theory against the manufacturer of the IV tube and connecting devices, Baxter Healthcare Corporation (Baxter). Shortly before trial, the plaintiff settled all claims against the medical malpractice defendants for a total of $2,880,000. The administrator then filed an amended complaint against Baxter alleging products liability and negligence theories.

Following trial, plaintiff dismissed the negligence claims and the matter was submitted to the jury on only the products liability theory. The jury awarded plaintiff $18,047,000. The award was reduced by a partial setoff of the amounts paid by the settling defendants.

On appeal, the appellate court found that the evidence was sufficient to justify the verdict based on a defective-design theory. The appellate court further found that the jury's verdict could not be sustained on the theory that Baxter breached its duty to warn of its products' inherent dangers. However, because the jury reached a general verdict, unchecked by any inconsistent answers to special interrogatories, the appellate court refused to disturb the verdict except to reduce the judgment amount by the full amount of the settlements. 309 Ill. App. 3d 869.

Baxter appeals to this court, primarily arguing that the appellate court erred in finding that the jury's verdict

could be supported under a defective-design theory. Plaintiff cross-appeals, arguing that we should reverse the appellate court's finding that Baxter had no duty to warn the medical profession of dangers inherent in its product. We affirm the judgment of the appellate court.

## BACKGROUND

Baxter designs, manufactures and distributes IV tubing sets to hospitals nationwide. These IV sets are prescription medical devices used to deliver fluids, such as blood products, medicines, or nutrients. An IV set consists of tubing and a connector, allowing it to be attached to other sections of tubing or to a catheter inserted into a patient's venous system.

There are two types of connectors: "friction-fit" and "Luer-lock." The friction-fit type consists of two mating tapered fittings. A medical professional must push the ends of the two fittings together with sufficient force to maintain a leak-proof connection. The Luer-lock type is similar to a friction-fit connector but also has a threaded collar that screws onto the hub of the catheter. In its patent application, Baxter stated that the Luer-lock was designed to overcome the problem of inadvertent disconnection that occurs with friction-fit connectors. Baxter continued to distribute both friction-fit and Luer-lock connectors to hospitals.

In March 1991, Andrina was admitted to Mt. Sinai Hospital for treatment of stomach ulcers. Following successful surgery, fluids were administered intravenously to Andrina through her jugular vein. This procedure is known as a "central line" application. Unfortunately, the Baxter friction-fit connector used to connect the IV tube to a catheter came apart, causing Andrina to suffer a seizure. She also suffered an air embolism resulting in brain damage, paralysis and, ultimately, death.

The administrator's complaint alleged, *inter alia*, that: (1) the tubing was unreasonably dangerous because

it was designed, manufactured, and sold without a Luer-lock connection; (2) the friction-fit connection failed when the product was used in a reasonably foreseeable manner; and (3) Baxter failed to warn of the likelihood of unintentional disconnection and the need to use tubing equipped with the Luer-locking device.

At trial, plaintiff called Baxter employees as adverse witnesses to establish the propensity of the friction-fit connectors to disconnect unintentionally and to prove that Luer-locking devices provided a more secure connection. According to Margaret Foss, a registered nurse and Baxter vice-president, Baxter was aware at the time Andrina was injured that friction-fit connectors sometimes failed due to patient movement. Foss admitted that this could cause air embolisms in central line applications. She conceded that friction-fit connectors were inadequate for central line use and that, in such instances, medical professionals should use Luer-locks. She testified, however, that Baxter did not encourage sales representatives to recommend Luer-locks for central line applications. Instead, Baxter simply made both products available to its customers.

Baxter's sales representatives provided similar testimony. For example, one representative admitted that she knew prior to Andrina's injury that friction-fit IV sets could unintentionally disconnect and should not be used in central line applications.

Birenda Lal, Baxter's chief engineer in charge of the IV product line, was called as an adverse witness. He testified that friction-fit connectors could accidentally disconnect. He also stated that friction-fit connectors were being used in central lines and agreed that an air embolism could result if they became disconnected. For this reason, he recommended using Luer-locks in central line applications. He added, however, that Baxter did not advise hospitals to use one product or the other, and Bax-

ter had not developed and marketed Luer-locks to prevent accidental disconnections or to increase patient safety. Rather, the Luer-lock mechanism was a competitive response to industry demands. Lal testified that adding Luer-locks to all connectors was technically feasible and would add between three and five cents to the cost of each unit. He believed that Baxter would put locking collars on all their connectors if customers demanded it.

Neil Sheehan testified as plaintiff's expert witness without objection. Sheehan is a mechanical engineer and had worked for several companies that developed and sold IV components. Sheehan had personally designed and, in some cases, patented medical devices, including IV equipment. He explained that the main problem with using a friction-fit connector was that the amount of force needed to disconnect it depended on several factors, including (1) the force used to connect it; (2) its composition; (3) the method used to sterilize it; and (4) variations in molding. Thus, the strength of the connection varied as different persons used different friction-fit connectors at different times. Generally, however, if the connection was made with less force, it was more likely to fail.

Sheehan also described the technical aspects of the Luer-lock. He stated that a Luer-lock prevents the accidental disconnection of IV lines and that it is four to five times stronger than a friction-fit. In order to disconnect a Luer-lock without unscrewing it, the components would have to be pulled apart with great force until the threads on one component tore. Sheehan testified that air embolisms can be avoided by using Luer-locks and that Luer-locks should always be used in central line applications. In his opinion, the friction-fit connector became obsolete once the Luer-lock became available.

In addition, Sheehan stated that it was foreseeable that friction-fit connectors might be used in a central

line application. He opined, however, that a friction-fit connection was not a safe design in *any* application and that it was especially hazardous when used in a central vein. He also believed that if medical personnel had used a Luer-lock connector, Andrina's injury would have been prevented.

Dr. William Schumer, chief of surgery at Mt. Sinai Hospital, testified that decisions regarding the purchase of medical supplies were made by a nursing products committee. He said that Luer-locks were not used at Mt. Sinai prior to the incident, and he believed that most hospitals did not use them at that time. He stated that he assumed friction-fit connectors were safe because they were readily available in the market.

The chair of the nursing products committee at Mt. Sinai testified that the hospital staff relied on product manufacturers to advise them of the appropriate uses for their products.

The nurse responsible for the actual purchase and distribution of medical supplies at Mt. Sinai stated that at the time of Andrina's injury she did not know the difference between a friction-fit connector and a Luer-lock connector. She also noted that at that time she did not know that friction-fits should not be used in central line applications.

Dr. Ricky Maddox, a second-year resident in general surgery at Mt. Sinai at the time of Andrina's operation, testified that he placed the catheter in Andrina's jugular vein. Although he knew about using friction-fit connectors on IV tubing, he was unfamiliar with Luer-lock connectors. He did not learn of them until after Andrina was injured, when they began to be used exclusively at Mt. Sinai Hospital.

Dr. Henry Roztoczynski, Andrina's surgeon, testified that he was aware that friction-fit connectors could unintentionally disconnect and that Luer-lock connectors

were safe to use in central lines. He never mentioned Luer-lock connectors to his colleagues at Mt. Sinai and did not advocate their use prior to the incident involving Andrina.

Dr. Norbert Strohmayer was a fifth-year surgical resident when he assisted Dr. Roztoczynski with Andrina's surgery. He testified that he was familiar with both friction-fit and Luer-lock connectors. He was unaware of the requisite force necessary to disconnect friction-fit connectors and could not specifically recall one coming apart. He was also unaware of any literature describing the frequency of accidental disconnection, although he read several well-known medical journals. He agreed that the unintentional disconnection of an IV device could have adverse effects in any application and is "never a good idea." He acknowledged that Luer-lock connectors were less likely to fail due to a patient's movement.

In its case in chief, Baxter presented testimony from two expert witnesses. First, William McVay, a "medical device consultant" with a degree in mechanical engineering, testified as an expert witness. He agreed that only Luer-locks should be used in central line applications. McVay acknowledged that Baxter was aware of the dangers of using friction-fit connectors in central lines but believed that Baxter was not obliged to reveal this information.

Next, Kathleen Medica, a registered nurse with a master's degree, testified as an expert witness for Baxter. In her opinion, a friction-fit connector was much more likely to fail than a Luer-lock, although she did not know whether this was a well-known complication in the field. She acknowledged that some nurses may never have had the experience of a friction-fit coming apart.

After hearing the evidence, the jury returned a general verdict for the decedent's estate. No special interrogatories were requested or submitted to the jury. The

trial court denied Baxter's post-trial motion seeking judgment notwithstanding the verdict or a new trial. Baxter then appealed.

Relying on the learned intermediary doctrine, the appellate court found that Baxter was not obliged to warn Andrina's health-care providers of the risks associated with friction-fit connectors because they already knew that such risks existed. 309 Ill. App. 3d at 882. The court found, however, that the evidence sufficiently supported the verdict based on the theory of defective design. 309 Ill. App. 3d at 883. The court affirmed the judgment but reduced the award by the full settlement amount. We granted Baxter's petition for leave to appeal. 177 Ill. 2d R. 315.

## ANALYSIS

Baxter argues that the appellate court erred in (1) holding that the patient, rather than the prescribing physician, is the "ordinary consumer" of prescription medical products; (2) finding that the connector was defective based on Sheehan's expert opinion testimony since he was an engineer and had no medical training; (3) performing its proximate cause analysis; and (4) applying risk-benefit analysis in determining whether the friction-fit connector was unreasonably dangerous due to a defect in its design.

Plaintiff argues that Baxter has waived the last three of these arguments. Therefore, we will first determine whether waiver applies here.

### A. Waiver

Baxter argues that the appellate court erred in finding a prescription medical product defective without expert medical testimony on its proper uses. On that issue, plaintiff offered only the testimony of Neil Sheehan, who is a mechanical engineer and lacks medical training.

We agree that Baxter failed to preserve this issue for

review. At trial, Baxter did not challenge Sheehan's qualifications to testify or the sufficiency of his testimony to support plaintiff's burden of proof. Baxter also failed to raise this issue in the appellate court and raised it for the first time in its petition for leave to appeal before this court. In *Daniels v. Anderson*, 162 Ill. 2d 47 (1994), we held that parties may not raise arguments for the first time on appeal. To do so weakens the adversarial process and would likely prejudice the other party, who did not present relevant evidence and argument on that issue at trial. *Daniels*, 162 Ill. 2d at 59. Baxter offers no persuasive reason to depart from the waiver doctrine in this case.

Baxter also argues that the appellate court erred in performing a proximate cause analysis. Plaintiff contends that Baxter failed to raise this argument in its petition for leave to appeal and therefore should be foreclosed from raising it now.

Again, we agree with plaintiff. Supreme Court Rule 315(b) provides that a party's petition for leave to appeal "shall contain *** (3) a statement of the points relied upon for reversal of the judgment of the Appellate Court." 177 Ill. 2d R. 315(b)(3). Failure to raise an argument in the petition for leave to appeal may be deemed a waiver of that argument. *Federal Deposit Insurance Corp. v. O'Malley*, 163 Ill. 2d 130, 154 (1994). Adherence to the rule is not a jurisdictional prerequisite to our review of an issue; it is a principle of administrative convenience. *Dineen v. City of Chicago*, 125 Ill. 2d 248, 265 (1988). Here, the issue of proximate cause was thoroughly and thoughtfully discussed in the appellate court's opinion and it need not be repeated here. We find no sufficient justification to overlook the administrative requirements of Rule 315 in this instance.

Finally, we examine whether Baxter has waived its argument that the appellate court erred in applying the

risk-benefit test in analyzing whether the friction-fit connector was unreasonably dangerous by reason of a defective design. We conclude that it has not. Although Baxter did not expressly designate this point as a separate argument in its petition for leave to appeal, it did argue that the appellate court's decision is contrary to a body of precedent prohibiting a finding of liability solely on the existence of an alternative design. Thus, the application of the risk-benefit test is inextricably intertwined with any fair analysis of the elements of plaintiff's defective design case. For that reason we will consider the merits of Baxter's argument on this issue.

### B. Duty To Warn

We first address whether Baxter had a duty to warn of dangers inherent in the friction-fit connector. For the reasons that follow, we conclude that it did.

Generally, the manufacturer of a prescription medical device has a duty to warn prescribing physicians or other health professionals who may prescribe the device of the product's known dangerous propensities. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 517 (1987). Likewise, physicians, using their medical judgment, have a duty to convey the warnings to their patients. *Kirk*, 117 Ill. 2d at 517. The duty to warn the health-care professional, rather than the ultimate consumer or patient, is an expression of the "learned intermediary" doctrine. A corollary of that doctrine is the principle that a prescription medical device manufacturer need not provide a warning of risks already known to the medical community. *Proctor v. Davis*, 291 Ill. App. 3d 265, 277 (1997). In this case, the appellate court held that Baxter had no duty to warn Mt. Sinai Hospital's doctors about the risks of disconnection of the friction-fit device because the medical community was already aware of those risks. 309 Ill. App. 3d at 882.

In plaintiff's request for cross-relief in this court, he

argues that the appellate court erred by finding that Baxter had no duty to warn as a matter of law because health-care providers already knew of the dangers associated with friction-fit connectors and the need to use Luer-locks. Plaintiff asserts that since there is conflicting evidence concerning the comparative knowledge of Baxter and the medical community about this peril, the jury was properly allowed to decide this issue.

We agree that the record contains sufficient conflicting evidence to raise factual questions concerning the comparative knowledge of Baxter and that of the medical community concerning both the danger of using friction-fits in central lines and the need to use only Luer-locks in these applications. The record indicates that Baxter's employees knew of the inherent dangers of friction-fits and that Baxter's patent indicates that Luer-locks were designed to avoid accidental disconnections. For example, both Baxter's chief engineer, Birenda Lal, and its expert medical device consultant, William McVay, knew that *only* Luer-locks should be used on central lines because they are less likely to come apart.

In contrast, the testimony from persons on the medical staff at Mt. Sinai shows that they had significantly less knowledge. The chairperson of the nursing products committee testified that hospital staff relied on product manufacturers to advise them regarding the appropriate uses of a product. The nurse responsible for the actual purchase and distribution of medical supplies at Mt. Sinai testified that, in March 1991, she did not know the difference between a friction-fit connector and a Luer-lock and that she did not know that friction-fit connectors should not be used in central lines.

Moreover, Dr. Norbert Strohmayer, the fifth-year resident who assisted at Andrina's surgery, was unaware of any literature describing the frequency of unintentional separation with friction-fit connectors, despite reading

and subscribing to several well-known medical journals. He was also unaware of the force necessary to disconnect a friction-fit connector.

In addition, Dr. Ricky Maddox, who actually placed the catheter in Andrina's jugular vein, stated that he was unfamiliar with Luer-lock connectors and did not learn about them until after the incident. Thus, he could not have known that friction-fit connectors should never be used in central line applications.

In *Proctor v. Davis*, 291 Ill. App. 3d 265 (1997), the appellate court held that a drug manufacturer that only shared information about its product's toxicity with its own employees breached its duty to warn the medical community because without this information, doctors could not provide appropriate and comprehensive medical advice for their patients. This prevented them from functioning as "learned intermediaries" to protect their patients' best medical interests. The court said, "Doctors who have not been *sufficiently* warned of the harmful effects of a drug cannot be considered 'learned intermediaries' and the adequacy of warnings is a question of fact, not law, for the jury to determine, as it did in the instant case." (Emphasis added.) *Proctor*, 291 Ill. App. 3d at 283.

In the instant case, Baxter gave the medical community no warning at all about the need to use Luer-locks in central line applications. Thus, this issue was properly submitted to the jury. The jury's general verdict for plaintiff could have been reasonably based on a finding that Baxter's knowledge with respect to the use of friction-fit connectors was superior to that of the medical community and thus Baxter breached its duty to warn. The evidence does not so strongly favor Baxter that the jury's conclusion cannot stand and therefore we will not disturb it on appeal. See *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). The appellate court erred by holding otherwise.

## C. Design Defect

We next consider whether the jury's verdict can be supported under a design-defect theory. We find that it can.

A manufacturer has a nondelegable duty to produce a product that is reasonably safe for all intended uses. *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 189 (1990). In *Lamkin v. Towner*, 138 Ill. 2d 510, 529 (1990), we said:

> "A plaintiff may demonstrate that a product is defective in design, so as to subject a retailer and a manufacturer to strict liability for resulting injuries, in one of two ways: (1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or (2) by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs."

The first way is commonly referred to as the consumer expectation test. The second is called the risk-utility or risk-benefit test. The appellate court held that under either test, the evidence justified a finding of defective design. We agree.

### 1. *The Consumer Expectation Test*

In affirming the jury's verdict, the appellate court held that it was not against the manifest weight of the evidence for the jury to find that the friction-fit device failed to meet Andrina's reasonable expectation that it would function properly. 309 Ill. App. 3d at 884.

Baxter contends that the health-care professional (rather than the patient) should be deemed "the consumer" for purposes of the consumer expectation test. This approach, Baxter argues, is consistent with the traditional application of the learned intermediary doctrine. Baxter further argues that this is true because, in the case of a prescription medical device, the patient has

no more independent ability to assess the product's risks or benefits than to appreciate or assess the warnings as to its use. Thus, under the consumer expectation test, the issue is whether the product is more dangerous than expected by the ordinary learned intermediary.

Neither Baxter nor its *amicus*, the Product Liability Advisory Council, has cited any Illinois authority in support of this argument. Baxter refers us to *Shanks v. Upjohn Co.*, 835 P.2d 1189 (Alaska 1992). In that case, the court concluded that a prescription drug is defectively designed and imposes strict liability on its manufacturer if it fails to perform as safely as an ordinary doctor would expect, when used by the patient in an intended and reasonably foreseeable manner. *Shanks*, 835 P.2d at 1195. In a footnote, the court observed:

> "With certain types of prescription drugs, the role of the doctor in the decision to use a specific product is significantly reduced. Examples of such atypical prescription products include contraceptives, where the patient initiates and directs the usage, drugs administered in a clinical setting with little or no physician involvement, or drugs marketed under a strategy designed to appeal directly to the consuming public. These are areas where courts have held that manufacturers have a duty to warn patients directly. In strict liability design cases involving such products, it may be appropriate to apply the 'ordinary consumer expectation' test rather than the 'ordinary doctor expectation test.' " *Shanks*, 835 P.2d at 1195 n.7.

In the case before us, the evidence showed that the decision to purchase friction-fit connectors was made exclusively by the nursing products committee at Mt. Sinai. The chairperson of that committee testified that the hospital staff relied on the product manufacturer to advise them of the proper uses for the product. The person who actually purchased the friction-fit connectors from Baxter's sales representative was not a physician and did not know that those devices should not be used in central line applications. Since the purchase of the

product had little physician involvement, it would appear that the facts in this case are similar to those described in the *Shanks* footnote. In such cases, the application of the "ordinary consumer" expectation test, rather than the "ordinary physician" expectation test, is appropriate.

Moreover, in *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525 (1996), plaintiff sought recovery on a strict liability theory against the manufacturer of a knee prosthesis that failed prematurely, causing personal injuries. The evidence was conflicting as to whether the device failed because of a design defect, a manufacturing defect, or both. In any event, this court held that the evidence was sufficient to support a finding that the plaintiff was injured by an unreasonably dangerous condition of the knee device. The court stated: "sufficient evidence was presented to support a finding that the device failed to perform in a manner reasonably expected in light of its nature and intended function and subjected the plaintiff to an unreasonable risk of harm beyond that contemplated by *an ordinary person.*" (Emphasis added.) *Haudrich*, 169 Ill. 2d at 542. Although the *Haudrich* court was not presented with the argument that the contemplation of the doctors, rather than the patient, should be controlling, that case clearly used the "ordinary person" standard in applying the consumer expectation test.

Andrina, who was conscious after surgery, could have reasonably expected that her IV catheter connection, if properly designed and manufactured, would be safe to use for its intended purpose. She was the person who would be harmed if the device failed. The expert testimony adduced at trial was sufficient to establish that the design of the device was defective and that this defective design caused her injury. Thus, we agree with the appellate court's conclusion that the jury's decision did not contradict the manifest weight of the evidence.

## 2. *The Risk-Utility Test*

Baxter also argues that the appellate court erred in finding that the jury's verdict could be supported under the risk-utility test. The appellate court held that the record supported a finding that a connector existed that would prevent foreseeable harm without hindering its function or significantly increasing its price. *Hansen*, 309 Ill. App. 3d at 884.

We disagree with Baxter on this point. As this court held in *Kerns v. Engelke*, 76 Ill. 2d 154, 162-63 (1979), a plaintiff may demonstrate that a product is unreasonably dangerous because of a design defect by presenting evidence of an alternative design that would have prevented the injury and was feasible in terms of cost, practicality and technological possibility. The record in this case contains sufficient evidence to establish that the Luer-lock collar was designed to, and would have, prevented an unintentional disconnection at a cost of between three and five cents per unit. This record is sufficient to sustain a finding of unreasonable dangerousness under a risk-utility analysis.

Baxter argues, however, that a risk-utility analysis is inappropriate in this case because the device in question is simple and because the risks are well-known to the medical community that uses the device.

Baxter cites *Scoby v. Vulcan-Hart Corp.*, 211 Ill. App. 3d 106 (1991), in support of its argument. In that case, the appellate court reviewed a grant of summary judgment by the trial court in favor of the defendant manufacturer of a deep-fat fryer used in a restaurant. Plaintiff was a cook who was burned when he slipped and lost his balance, causing his arm to be submersed in hot oil. Plaintiff claimed the injury could have been prevented if the fryer had been equipped either with a simmer cover or a tank cover. The manufacturer offered each protective cover as a separate product. The parties stipulated that the purpose of the simmer cover was to

trap moisture in the product being cooked, and that the purpose of the tank cover was to prevent vermin from getting into the jelled cooking oil after it had cooled. Neither cover was developed or marketed as a safety device. In affirming the trial court's decision, the appellate court remarked:

> "We do not deem that *Lamkin* or other cases applying aspects of the danger-utility test intend that all manufacturers of products described above should be subject to liability depending upon a trier of fact's balancing under that test, when suit is brought by one injured by such a product. Somewhere, a line must be drawn beyond which the danger-utility test cannot be applied. Considering not only the obvious nature of any danger here but, also, the simple nature of the mechanism involved, we conclude the circuit court properly applied only the consumer-user contemplation test." *Scoby*, 211 Ill. App. 3d at 112.

That conclusion is not compelled by the facts in this case. Baxter's patent application stated that the Luerlock was designed to overcome the problem of inadvertent disconnection of the friction-fit. Thus, it is reasonable to infer that Baxter, unlike the manufacturer in *Scoby*, developed and marketed its product as a safety device. As plaintiff's expert Neil Sheehan testified, the likelihood of disconnection of a friction-fit device is dependent on several variables, including the force applied to engage it, differences in molding and differences in sterilization procedures. Sheehan further opined that the friction-fit connectors became obsolete once the Luerlock was invented.

Even though the doctors assumed the friction-fit device was safe to use in central line applications, the reasonable conclusion is that the danger in the friction-fit was not obvious, nor was the mechanism simple. There can be no rational comparison between this device and a kettle of boiling oil. Thus, *Scoby* is inapposite. We believe the analysis of the appellate court was correct on this issue and we hold that the jury's decision against Baxter

based on application of the risk-utility test was not against the manifest weight of the evidence.

Baxter also argues that if the risk-utility test is to be applied in the defective design analysis, then we should apply the standard defined by the new Restatement (Third) of Torts. That standard would allow a finding of unreasonably dangerous design only if reasonable health-care providers, knowing the foreseeable risks and therapeutic benefits, would not prescribe the device for any class of patients. Restatement (Third) of Torts: Product Liability § 6 (1998).

Baxter did not argue this point in the trial court and it was asserted for the first time in Baxter's reply brief in the appellate court. The appellate court, however, made no reference to this argument in its opinion. Application of the Restatement (Third) of Torts standard would apparently require expert medical testimony to establish whether reasonable health-care providers, knowing the foreseeable risks and therapeutic benefits of the friction-fit device, would prescribe it for any class of patient. No such expert medical testimony was proffered by either party. We have already held that Baxter waived the argument that it was error to rely on the testimony of a mechanical engineer with no medical training or expertise and, thus, there is no evidentiary basis for the application of the Restatement (Third) of Torts standard. We decline, therefore, to address this issue. We do not foreclose the consideration of the Restatement (Third) of Torts standard in another case where it is raised at trial and is appropriately briefed and argued.

## CONCLUSION

We disagree with the appellate court's conclusion that, under the learned intermediary doctrine, Baxter had no duty to warn of the inherent dangers associated with friction-fit locks. We find that the duty to warn was properly submitted to a jury and that the jury's verdict

does not contradict the manifest weight of the evidence. We agree with the appellate court's conclusion that the defective-design theory was properly submitted to a jury and that the verdict does not contradict the manifest weight of the evidence.

Therefore, for the reasons stated, we affirm the judgment of the appellate court, which affirmed the judgment of the circuit court as modified.

*Appellate court judgment affirmed.*