RICHARD MELE, Plaintiff-Appellee and Cross-Appellant, v. HOWMEDICA, INC., Defendant-Appellant and Cross-Appellee.

First District (1st Division)   Nos. 1—01—4228, 1—01—4229 cons.

Opinion filed March 15, 2004.—Rehearing denied May 14, 2004.

2

4

McKenna, Storer, Rowe, White & Farrug, of Chicago (Thomas A. Reed, Thomas F. Lucas, and Christopher J. Dalke, of counsel), and David Klingsberg, Maris Veidemanis, and Kay Scholer, L.L.P., of New York, for appellant.

William J. Harte, Ltd. (William J. Harte, of counsel), and Patrick J. Kenneally, Ltd. (Thomas L. Trinley, of counsel), both of Chicago, for appellee.

JUSTICE McNULTY delivered the opinion of the court:

In August 1994 Richard Mele sued Howmedica, Inc., the manufacturer of a medical device a surgeon implanted into plaintiff. The trial court denied plaintiff's motion for certification of a class of all patients into whom surgeons in Illinois implanted similar devices. A jury found that plaintiff did not have notice of wrongful causation for his injury

until September 1992. The jury also found that Howmedica's unreasonably dangerous medical device caused plaintiff's injury. The court entered judgment on the jury's verdict awarding plaintiff $400,000 in damages. Defendant appeals and plaintiff cross-appeals from denial of the motion to permit the lawsuit to proceed as a class action.

## BACKGROUND

Plaintiff had severe arthritis in his right hip. He went to Dr. Mitchell Sheinkop, an orthopedic surgeon, in May 1991. Dr. Sheinkop recommended a total replacement of the hip with artificial components. Plaintiff agreed. Dr. Sheinkop performed the surgery on May 28, 1991.

To gain access to the hip, Dr. Sheinkop needed to cut through the femur, the bone that extends from the hip to the knee. The femur has a nearly spherical head which fits into the acetabular cup of the hip; near the femur's head lies a large protuberance called the trochanter, where several muscles attach to the bone. Dr. Sheinkop performed a trochanteric osteotomy on plaintiff. That is, he cut through the bone and pulled out the top part, including the trochanter.

Dr. Sheinkop then cemented an artificial stem into the marrow canal of the femur. The artificial stem connected to an artificial, nearly spherical head of the femur, designed to move smoothly in an artificial acetabular cup. Dr. Sheinkop implanted an artificial acetabular cup, with a smooth polyethylene lining, into plaintiff's hip, to complete the artificial joint.

After inserting the artificial pieces, Dr. Sheinkop reattached the top part of the femur, including the trochanter, to the portion of the femur that remained in place during the surgery. For the artificial hip to perform properly, the femur must heal, with the top part of the femur realigning with the body of the femur. When Dr. Sheinkop put the top of the femur back in place, he secured it to the body of the femur with a Dall-Miles trochanter cable grip system (D-M system) manufactured by defendant.

On the day of surgery, shortly after the operation, Dr. Sheinkop discovered a dislocation of the hip. About 7% of patients experience similar dislocations following hip replacement surgery. Dr. Sheinkop and his assistants, using accepted techniques, manipulated the hip back into place.

At follow-up visits in February and September 1992, plaintiff complained to Dr. Sheinkop of pain in the hip. Dr. Sheinkop took X rays during both visits. According to the medical record for September 18, 1992, Dr. Sheinkop then "introduced the thought of removing the Dall-Miles cable system" to alleviate the pain. In a

second surgery performed on January 28, 1993, Dr. Sheinkop removed the D-M system.

In September 1997 plaintiff consulted another doctor about increasing pain in his thigh. New X rays showed that plaintiff had suffered endosteal lysis, which is a form of severe bone loss. The doctor recommended revision surgery to replace several elements of the artificial hip. Dr. Aaron Rosenberg performed the revision surgery in November 1997. Plaintiff recovered well from the surgery.

The complaint filed in August 1994 included a class action count, in which plaintiff sought to represent all persons into whom surgeons implanted the D-M system in the course of hip surgeries performed in Illinois. Plaintiff listed several questions allegedly common to claims of all class members, including the question of whether the D-M system had a design defect rendering defendant strictly liable in tort and whether defendant negligently designed the D-M system. Plaintiff also requested class certification with the class action limited to "one or more of the common questions" listed.

Plaintiff supported his motion for class certification with an article reporting on a study of the D-M system. C. Silverton, *Complications of a Cable Grip System*, 11 J. Arthroplasty 400 (1996). Dr. Silverton reported that, at the one hospital studied, five surgeons used the D-M system in 68 surgeries performed between January 1990 and July 1992. Eight of the patients had large deposits of metal debris near the joint of the femur with the hip. 11 J. Arthroplasty at 401. "Bone destruction or osteolysis around the cable in the area of the lesser trochanter was seen in seven patients (10%)." 11 J. Arthroplasty at 401. Five of the patients needed reoperations due to painful cables and fragmentation. 11 J. Arthroplasty at 401. As a result of the study, the hospital decided not to use the D-M system for routine trochanteric osteotomies. 11 J. Arthroplasty at 404.

Plaintiff found two other patients who filed lawsuits against defendant alleging defective design of the D-M system.

After argument on the motion for class certification, the court said:

> "[B]ifurcation, as I understand it, at least deals with establishing liability first and then going on to damages.
>
> And I don't think that's what we're doing in this particular case. I have trouble certifying the class for a number of reasons.
>
> It's a medical device. And I went through the transcript, and as I understand it, there's not great numerosity here.
>
> * * *
>
> [Dr. Silverton] mentions a doctor in Boston who's had excellent results. And so Silverton says I can't understand why we had these results.

* * *

I just can't say I have numerosity because these people have the device implanted in them. ***

* * *

It's not a tort liability like an airplane crash where *** it arises out of one occurrence. ·

* * *

*** [I]f I would certify the class, it would result in piecemeal litigation with troubling issues of causation and damage left unresolved.

It seems to me that too many details would be left unresolved, and complex individual trials would need to be adjudicated as well.

*** I don't think that (A) you established numerosity.

You talk about predominance, and we talk about adequacy of representation. I don't think that he's a proper class representative because these are tort cases, and they are very different than the mass disaster torts ***.

I think they are completely different. I think it's a products case. And I think that looking down the line, I think there are too many individual legal issues that really predominate."

Plaintiff moved for clarification of the basis for denial of class certification. The court denied the motion. Plaintiff then moved for an order pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308) to permit immediate appellate review of the denial of class certification. At the hearing the court responded:

"[T]here are individual issues in this thing that make it very difficult for you to have class certification. ***

I've read the cases. When you have product liability cases that concern medical devices I think that the courts are hesitant to move in that area. *** And for that reason and for a multitude of other reasons, which have been argued for many many hours now, I am going to deny the [Rule] 308 request."

After plaintiff's second deposition, defendant moved for summary judgment, arguing that the deposition testimony showed that by February 1992 plaintiff had sufficient notice of wrongful causation to trigger the statute of limitations period. The defendant argued that the filing of the complaint in August 1994 came too late. The trial court found material issues of fact concerning the time plaintiff discovered wrongful causation for his injury. Accordingly, the court denied the motion for summary judgment.

Before trial plaintiff moved to exclude evidence of ·

"the expectation of injury by anyone other ·than [an] implantee patient; *** the comparative superiority of the Dall-Miles cable over other fixation devices; *** the fact that there was a need for a

cable in view of problems with earlier fixation devices; \*\*\* the fact that other fixation devices or other cable can abrade bone, fray or fragment; \*\*\* [and] a risk versus benefit test."

Plaintiff sought to prove that the D-M system was designed defectively in that it did not perform as safely as an ordinary implantee would expect. He argued that the evidence he sought to exclude bore no relevance to the case, because the evidence would rebut only a case in which a plaintiff tried to show that another design could achieve similar benefits with less risk. Defendant argued that surgeons who implanted the system were its consumers for purposes of determining whether the device met the expectations of ordinary consumers. In the alternative defendant sought to show that the benefits of the product outweighed its risks.

The court held:

"[I]n this case, the plaintiffs have decided to bring their action on strict liability in tort based only on the consumer user contemplation test.

So that would for the court set up the parameters of what is relevant. I did not see a case where that was the claim and solely that being the consumer user approach where that was used by the plaintiff that the defense could then \*\*\* rebut that claim or put on a defense of the danger utility or risk benefit when the sole claim was the consumer user expectation test.

So the court is going to judge the relevance of what evidence goes in \*\*\* based on the claim of the plaintiff. \*\*\*

\* \* \*

\*\*\* And the risk benefit analysis is out given the pleadings by the plaintiff."

At trial plaintiff testified that when he complained of pain nine months after the initial surgery, on February 28, 1992, Dr. Sheinkop told him that such pain was a "very normal" part of recovery, and it may persist for 18 months after a successful surgery. The pain persisted into September, when plaintiff next visited Dr. Sheinkop. Plaintiff testified that Dr. Sheinkop then suggested that the D-M system might be the cause of the pain and that plaintiff might want the system removed. Contrary to his trial testimony, plaintiff at his second deposition had testified that he learned in February 1992 that the D-M system caused the pain. At trial plaintiff explained that he confused the dates in his testimony at the second deposition. Prior to the September 1992 visit with Dr. Sheinkop, he had never heard of the D-M system, and he had no idea Dr. Sheinkop had placed such a device in him. Plaintiff testified that he was very surprised to learn about the system and to learn that it might be the cause of his pain.

According to plaintiff, the first surgery in May 1991 relieved the pain from arthritis that led him to choose hip replacement surgery. But new pains began around February 1992. Plaintiff described the pain and disability he suffered from that time until spring of 1998, when he completed his recovery from his third hip surgery, the revision operation Dr. Rosenberg performed. The surgical removal of the D-M system in January 1993 did not alleviate the pain.

On cross-examination plaintiff admitted that shortly after February 1992 he telephoned a friend of his neighbor who worked as an attorney. He discussed with the attorney possible legal liability for the pain he continued to suffer. But plaintiff did not then meet with or retain an attorney.

Dr. Sheinkop testified that as a general practice he discussed with each patient the benefits and risks associated with the surgery proposed for the patient. He usually would not discuss the possibility of dislocation with hip replacement patients. He would not describe the trochanteric osteotomy, as part of the hip replacement, to his patients. And he usually would not mention the device he used to reattach the parts of the femur following a trochanteric osteotomy. Dr. Sheinkop did not recall giving any special warnings to plaintiff.

Dr. Sheinkop described the first surgery and his use of the D-M system. He secured the top of the femur, including the trochanter, to the body of the femur by drilling a hole in the trochanter and passing the cable of the D-M system through the hole. He cut the end of the cable with a cutter that was also part of the D-M system. The cable, attached to the grip, then held the two parts of the bone in place.

The cable consisted of a number of wires wound together. The wound wires gave the cable a rougher surface than an individual monofilament wire. Dr. Sheinkop believed that when plaintiff walked the cable moved very slightly back and forth through the bone. Dr. Sheinkop characterized this effect as micromotion that acted like a saw against the bone. The abrasion of the cable separated small particles of the bone near the hole from the rest of the bone. X rays of plaintiff's femur showed expansion of the hole for the cable. In September 1992 Dr. Sheinkop noted in plaintiff's medical record that the X ray showed bone loss in connection with the D-M system.

In general Dr. Sheinkop would discuss the X rays with the patient the same day he took them. He admitted that the X ray he took in February 1992 showed expansion of the hole drilled for the cable, probably due to the sawing effect of the cable against the bone. He did not specifically remember when he discussed the D-M system and this possible effect with plaintiff.

Dr. Rosenberg agreed with Dr. Sheinkop that the cable sawing

against the bone caused bone loss. The particles of bone sawed off could then migrate into the acetabular cup, coming between the artificial head and the polyethylene lining of the cup. The bone particles, possibly together with metal debris from the cable, scraped polyethylene particles off the lining of the cup when plaintiff moved his leg. This process released polyethylene particles into the body. While the body's response to loose bone particles is relatively benign, the body responds more aggressively to loose particles of polyethylene or other foreign bodies. Macrophages attack these displaced foreign particles, and these macrophages "[c]an stimulate bone ingestion by other cells."

In Dr. Rosenberg's opinion, this process led to plaintiff's painful endosteal lysis. The revision surgery provided support for Dr. Rosenberg's opinion: when he removed the artificial acetabular cup from plaintiff in 1997, Dr. Rosenberg found the cup badly pitted and scratched, with many abrasions of the polyethylene surface. Bone particles observed in several X rays further supported Dr. Rosenberg's opinion about the causal connection between the D-M system and plaintiff's endosteal lysis.

Plaintiff's attorney asked about the source of the particles that tore the lining of the acetabular cup. Dr. Rosenberg said:

"I don't know what the third body wear particles were in this case other than through the study of these devices by pathologists and other experts who have looked at them.

*** [I]t seems to me that [you are] asking for potential sources of debris[. I]t's from all the parts that were implanted.

You can get debris caused by the plastic, by the cables, by the cable grip interaction, by the cable bone interaction, by the head, the neck junction interaction where you can get corrosion and corrosion products."

On cross-examination Dr. Rosenberg admitted that a study showed patients with artificial hips needed replacements on average 62 months after the initial implantation. Plaintiff had his first artificial hip for about six years. Dr. Rosenberg also agreed that bone loss is a common complication of hip replacement surgery, with or without the D-M system. On redirect Dr. Rosenberg reiterated his opinion that the D-M system was a contributing cause of plaintiff's endosteal lysis and the pain he experienced from 1992 until recovery from the revision surgery.

Plaintiff's expert, Dr. Alan Litsky, agreed with most of Dr. Rosenberg's opinions. Dr. Litsky testified that the D-M system was unreasonably dangerous in that plaintiff, like ordinary implantees, had no reason to expect injury from the D-M system. Dr. Litsky agreed that

most patients, like plaintiff, "would have no knowledge base whatsoever to make a judgment as to how that fixation system should perform." But he said, "Even if [patients] don't know what is going on, they expect the devices that their surgeon chooses to use to help, and not injure."

Defendant presented its experts on issues of causation and the performance of the D-M system. Defendant also made an offer of proof outlining the evidence it would have produced to show that the benefits of the D-M system outweighed its risks. Dr. Sheinkop would have testified that the cable in the D-M system did not break as easily as monofilament wires used in other systems for fixing femurs. The D-M system made the fractures more stable and provided better fixation. All fixation devices for repairing the femur after a hip replacement could destroy the bone or fail, and they created other risks as well. A fixation device that used a monofilament wire would have a similar abrasive effect in a case like plaintiff's.

Defendant's experts would have echoed much of Dr. Sheinkop's assessment of the benefits of the D-M system. They would have explained the state of medical knowledge in 1988, when defendant first manufactured the D-M system, and in 1991 when plaintiff underwent his first hip surgery. They would have explained the reasons for developing the system and how it solved several problems found with other fixation systems for trochanteric osteotomies. An expert would specifically testify that the benefits of the D-M system outweighed its potential risks.

The jury answered a number of special interrogatories defendant requested. The jurors specifically found the cable in the D-M system unreasonably dangerous, and they found that the dangerous condition of the cable caused plaintiff to suffer injury. Although the jurors also found the cable cutter unreasonably dangerous, they held that the cutter did not cause plaintiff's injuries. The jurors also found that prior to August 1992, plaintiff did not know that he suffered an injury from enlargement of the drill hole used to attach the cable. They found that plaintiff did not have sufficient notice, prior to August 1992, that his injury may have had a wrongful cause. The jury awarded plaintiff $400,000 in itemized damages. The trial court entered judgment on the verdict.

In the posttrial motion defendant repeated the argument that the trial court should have tested the danger of the device by the doctors' expectations instead of the implantee's expectations. Defendant also contended that the court erred by excluding evidence of the benefits and risks of the D-M system. The court denied the posttrial motion. Defendant filed a timely notice of appeal, and plaintiff filed a separate

appeal from the denial of his motion for class certification. We consolidated the appeals and directed the parties to brief the class certification issue as a cross-appeal.

## DISCUSSION

### I. Statute of Limitations

Defendant argues that the trial court should have entered judgment in its favor because the evidence overwhelmingly proved that plaintiff did not file his complaint within two years from the date on which the cause of action accrued. See 735 ILCS 5/13—202 (West 1994). In the alternative, defendant requests a new trial on the issue because the manifest weight of the evidence opposed the jury's answer to the special interrogatory.

The parties agree that the cause of action accrued when plaintiff knew or should have known that he had suffered an injury and that wrongful acts caused the injury. *Clay v. Kuhl*, 189 Ill. 2d 603, 608 (2000). Plaintiff admitted that he felt significant pain by February 1992, and he spoke to Dr. Sheinkop about that pain during an office visit that month. According to plaintiff's trial testimony, Dr. Sheinkop then told him the pain was normal during the extended period for recovery from the hip replacement surgery. Plaintiff first learned that his pain might have a wrongful cause in September 1992, when Dr. Sheinkop suggested he might need to remove the D-M system. Dr. Sheinkop's notes of the two visits corroborate plaintiff's trial testimony. In one of his depositions plaintiff said he learned in February 1992 the D-M system might have caused his pain, but at trial plaintiff explained that questions at the deposition confused him about the dates of the conversations.

Defendant contends that plaintiff's trial testimony is incredible because plaintiff spoke to an attorney about possible legal liability for his pain shortly after the February office visit. Also, Dr. Sheinkop usually discussed X rays with his patients the same day he took them, and the February 1992 X ray showed the expansion of the drill hole in the trochanter due to the sawing effect of the cable. But Dr. Sheinkop did not say that he recognized that damage when he first saw the X ray in the meeting with plaintiff.

We cannot say that plaintiff's testimony is so incredible that the jury committed manifest error by relying on it. See *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 741 (2001). Thus, the jurors could find that Dr. Sheinkop suggested a nonactionable cause for the pain in February 1992. Plaintiff's subsequent conversation with an attorney indicates he may have harbored some doubts about Dr. Sheinkop's explanation.

Plaintiff did not retain an attorney until sometime after September 1992, when Dr. Sheinkop first suggested that the D-M system might be the cause of plaintiff's pain. The conversation with an attorney, standing alone, is insufficient to overturn the jury's finding that plaintiff did not have sufficient notice that wrongful acts may have caused his pain until September 1992. See *Hochbaum v. Casiano*, 292 Ill. App. 3d 589, 594-95 (1997); *Gara v. Semerad*, 183 Ill. App. 3d 622, 628-30 (1989).

## II. Causation

■ Next, defendant claims that plaintiff failed to present sufficient evidence to support the jury's finding that the D-M system caused the endosteal lysis. Dr. Rosenberg explained how the cable chafed the bone particles off the bone and the bone particles migrated to the artificial hip. There the bone particles aggravated normal wear on the joint, gouging particles of polyethylene off the acetabular cup when plaintiff walked. Plaintiff's body attacked the polyethylene particles with microphages, which have the unfortunate side effect of destroying healthy bone, thereby causing the endosteal lysis.

In the course of this testimony, Dr. Rosenberg admitted that, apart from the studies of other experts, he did not know what particles interposed themselves between the artificial acetabular cup and the artificial head of the femur. Defendant claims this admission shows such uncertainty of the cause that the jury could not rely on Dr. Rosenberg's testimony as proof of causation. Dr. Rosenberg explained his conclusion, from the studies, that particles of various sorts, including bone particles chafed off by the cable, all contributed to the extraordinary gouging of the cup lining. The concession that he needed to rely on other experts does not defeat the evidence of causation. See *Bong Jin Kim v. Nazarian*, 216 Ill. App. 3d 818, 827 (1991).

## III. Unreasonable Danger

■ To show that a product is unreasonably dangerous due to a defective design, a plaintiff must present evidence that the design includes "a defect which subjects those exposed to the product to an unreasonable risk of harm." (Emphasis omitted.) *Hunt v. Blasius*, 74 Ill. 2d 203, 211 (1978). The risk of harm qualifies as unreasonable if it is " 'beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Palmer v. Avco Distributing Corp.*, 82 Ill. 2d 211, 216 (1980), quoting Restatement (Second) of Torts § 402A, Comment *i* (1965). The plaintiff may show this in either of two ways:

"(1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or (2) by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs." *Lamkin v. Towner*, 138 Ill. 2d 510, 529 (1990).

Defendant raises three arguments to show that plaintiff did not present sufficient evidence to support the jury's finding that the D-M system was unreasonably dangerous. Defendant claims that plaintiff failed to show (1) a specific defect in the design of the D-M system or (2) what an ordinary implantee would expect from the D-M system. Defendant also argues that the trial court should have applied the doctor's expectation test to determine unreasonable danger, and under that standard the evidence overwhelmingly proves that the D-M system was not more dangerous than the ordinary doctor would expect. We address the three arguments in turn.

## A. Specific defect

■ Plaintiff here presented Dr. Litsky's testimony that the design of the D-M system, with the use of cable passed through the bone, created a risk of harm from chafing off bone particles, and ordinary implantees would not expect such a risk. We find that plaintiff sufficiently specified a design defect.

## B. Implantee expectation

■ Defendant also claims that plaintiff's admission that he did not know of the D-M system when he had the artificial hip implanted proves that he did not have any expectations concerning the safety of the system. Similarly, Dr. Litsky's testimony that most implantees would not know about the D-M system, according to defendant, supports the conclusion that consumers have no expectation concerning the safety of the design.

Even if implantees have no expectation specific to this particular part of the artificial hip, they may have relevant expectations about the safety of the artificial hip as a whole. The consumer expectation test usually does not require any evidence of ordinary consumer expectations, because the finder of fact may rely on its own experiences to determine what an ordinary consumer would expect. See *Van Dettum v. K mart Corp.*, 133 Ill. App. 3d 861, 863-64 (1985). Thus, in *Buehler v. Whalen*, 41 Ill. App. 3d 446, 454 (1976), *aff'd*, 70 Ill. 2d 51 (1977), the jury did not need testimony from consumers to reach the conclusion that car buyers do not expect their cars to burst into flames

in collisions. "Whether a product is unreasonably dangerous is a question of fact to be determined by the jury. *** '[T]he jury can draw their own reasonable conclusions as to the expectations of the ordinary consumer and the knowledge common in the community at large.' " *Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 235, 429 A.2d 486, 489 (1980), quoting *Slepski v. Williams Ford, Inc.*, 170 Conn. 18, 23, 364 A.2d 175, 178 (1975). Plaintiff presented sufficient evidence to support the finding that an ordinary implantee would not anticipate this kind of danger from the D-M system.

## C. Doctor's expectations

Based on *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1196 (Alaska 1992), defendant contends that the trial court should have considered the doctors the consumers of medical devices for purposes of the consumer expectation test of unreasonable danger. The defendants in *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420 (2002), also relying on *Shanks*, raised the same argument. Our supreme court observed that it had applied the "ordinary person" standard, and not the ordinary doctor standard, to assess the danger of a prosthetic knee in *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 541 (1996). *Hansen*, 198 Ill. 2d at 435. The court added that in both *Hansen* and *Haudrich*, the patient "was the person who would be harmed if the device failed." *Hansen*, 198 Ill. 2d at 435. The court in *Hansen* again applied the consumer expectation test, evaluating the dangers of the medical device at issue from the point of view of the ordinary patient rather than the ordinary doctor.

■ We find that *Haudrich*, as interpreted in *Hansen*, controls our consideration of this issue. Just as the jury should assess the dangers of a prosthetic knee from the standpoint of the ordinary implantee, the jury should assess the dangers of the components of a prosthetic hip from the standpoint of the ordinary implantee. The trial court correctly rejected the proposal to assess risks from the standpoint of the ordinary doctor.

Plaintiff presented sufficient evidence to support the conclusion that a specific defect in the design of the D-M system caused the system to fail to perform as safely as the ordinary patient would expect. Thus, the evidence sufficiently supports the jury's conclusion that the D-M system was unreasonably dangerous under the consumer expectation test.

## IV. Restatement (Third) of Torts

■ Next, defendant asks us to adopt section 6(c) of the Restatement (Third) of Torts: Product Liability. That section provides:

"A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients." Restatement (Third) of Torts: Products Liability § 6 (1998).

This section completely eliminates appraisal of the consumer's expectations from determination of whether a medical device is unreasonably dangerous. Thus, the section conflicts with Illinois law. See *Lamkin*, 138 Ill. 2d at 529; *Hansen*, 198 Ill. 2d at 435.

Moreover, the section provides manufacturers with virtual immunity from liability for all medical products. Even when doctors discover unexpected injuries due to a medical device, they may find the device useful in some extreme cases. While Dr. Silverton reported that the hospital discontinued use of the D-M system for routine trochanteric osteotomies, he specifically added, "there may be an appropriate role for cable use in other settings (fixation of femoral shaft fractures, allograft plates, or extended trochanteric osteotomies)." 11 J. Arthroplasty at 404. Under section 6(c), the fact that the device remains useful for some patients would immunize the manufacturer from liability. Rare indeed is the device that can never prove useful for any patients.

Commentators have noted that section 6(c) represents a substantial departure from established common law throughout the country. M. Wagner & L. Peterson, *The New Restatement (Third) of Torts Shelter from the Product Liability Storm for Pharmaceutical Companies and Medical Device Manufacturers?*, 53 Food & Drug L.J. 225, 233 (1998). The standard proposed in section 6(c) "was created by the reporters without apparent precedent in case law." 53 Food & Drug L.J. at 233. Most courts that have considered related provisions of the Restatement (Third) have refused to adopt them. See, *e.g.*, *Delaney v. Deere & Co.*, 268 Kan. 769, 785-93, 999 P.2d 930, 942-46 (2000); *Green v. Smith & Nephew AHP, Inc.*, 245 Wis. 772, 822-26, 629 N.W.2d 727, 751-52 (2001); *Vautour v. Body Masters Sports Industries, Inc.*, 147 N.H. 150, 156-57, 784 A.2d 1178, 1183-84 (2001); *Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 208-09, 792 A.2d 1145, 1159 (2002).

Adoption of section 6(c) would change basic principles applicable to product liability suits. Such a fundamental shift should come from the legislature and not this court. See *Kellermann v. Car City Chevrolet-Nissan, Inc.*, 306 Ill. App. 3d 285, 291 (1999). We do not adopt the new standard proposed in section 6(c) of the Restatement (Third) of Torts: Product Liability.

## V. Evidence of Benefits and Risks

■ Defendant argues that the trial court committed reversible error by granting plaintiff's motion *in limine* to exclude all evidence of the benefits and risks of the D-M system. Plaintiff counters first that defendant waived the argument. But defendant opposed the motion, made an offer of proof at trial, and raised the issue in its posttrial motion. We find no waiver. See *Turgeon v. Commonwealth Edison Co.,* 258 Ill. App. 3d 234, 246 (1994).

■ Generally, we review a trial court's ruling on a motion *in limine* for abuse of discretion. *Beehn v. Eppard,* 321 Ill. App. 3d 677, 680 (2001). "However, a trial court must exercise its discretion within the bounds of the law. [Citation.] Where a trial court's exercise of discretion relies on an erroneous conclusion of law, *** our review is *de novo.*" *Beehn,* 321 Ill. App. 3d at 680-81. Insofar as the argument rests on an issue of law, we review the ruling here *de novo.*

The court found the evidence of the design's benefits and risks irrelevant because plaintiff sought to prove only that defendant's product failed to meet the ordinary consumer's expectations for the safety of the product. Although plaintiff, under the pleadings, might also have sought to prove the design of the D-M system unreasonably dangerous by showing its risks outweighed its benefits, he decided not to do so. The parties cited no Illinois authority on the issue of whether a defendant may present evidence that the benefits of a product's design outweigh its risks when a plaintiff argues that the product is unreasonably dangerous because it fails to meet ordinary consumer expectations for its safety.

The consumer expectation test for unreasonable danger derives from comment *i* to section 402A of the Restatement (Second) of Torts. *Palmer,* 82 Ill. 2d at 216. Other states have adopted this comment and apply a version of the consumer expectation test for unreasonable danger of a product design. See *Camacho v. Honda Motor Co.,* 741 P.2d 1240, 1250 (Colo. 1987) (Vollack, J., dissenting) (and cases cited therein). Several jurisdictions that have adopted comment *i* permit evidence of the benefits and risks of a product, holding it relevant to what a reasonable consumer should expect concerning the safety of the product. See *Potter v. Chicago Pneumatic Tool Co.,* 241 Conn. 199, ___, 694 A.2d 1319, 1333 (1997) (and cases cited therein). These jurisdictions merge the consumer expectation test and the risk-benefit test into a single test for unreasonable danger of a product's design. See, *e.g., Seattle-First National Bank v. Tabert,* 86 Wash. 2d 145, 154-55, 542 P.2d 774, 779 (1975).

Our supreme court adopted the two separate tests for unreasonable danger from a decision of the Supreme Court of California. *Barker*

*v. Lull Engineering Co.*, 20 Cal. 3d 413, 432-33, 573 P.2d 443, 455-56, 143 Cal. Rptr. 225, 237-38 (1978); *Lamkin*, 138 Ill. 2d at 529. The California court later explained the application of the tests in *Soule v. General Motors Corp.*, 8 Cal. 4th 548, 566, 882 P.2d 298, 308, 34 Cal. Rptr. 2d 607, 617 (1994):

> "In some cases, therefore, 'ordinary knowledge ... as to ... [the product's] characteristics' (Rest. 2d Torts, Supra, § 402A, com. i., p. 352) may permit an inference that the product did not perform as safely as it should. If the facts permit such a conclusion, and if the failure resulted from the product's design, a finding of defect is warranted without any further proof. The manufacturer may not defend a claim that a product's design failed to perform as safely as its ordinary consumers would expect by presenting expert evidence of the design's relative risks and benefits." (Emphasis omitted.)

Thus, where ordinary consumers have sufficient knowledge of a product's characteristics and the plaintiff seeks to prove only that the product did not perform as safely as consumers expect, the court may preclude a defendant from presenting expert evidence of the risks and benefits of the product.

The court in *Soule* examined several cases in which California courts held that ordinary consumers would not have sufficient knowledge of a product's safety characteristics. The court approved the holding of *Rosburg v. Minnesota Mining & Manufacturing Co.*, 181 Cal. App. 3d 726, 226 Cal. Rptr. 299 (1986), where

> "[the] plaintiff claimed she was entitled to judgment under the consumer expectations test because her own testimony that she believed her breast implants would last a lifetime without leaking was the only lay evidence of what consumers expected. *** [T]he Court of Appeal ruled that breast implant performance is beyond common experience, and that expert testimony on what the consumer should expect was therefore relevant and admissible." (Emphasis omitted.) *Soule*, 8 Cal. 4th at 566, 882 P.2d at 307, 34 Cal. Rptr. 2d at 616.

The court summarized the law in California:

> "[T]he consumer expectations test is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design. It follows that where the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer would or should expect. Use of expert testimony for that purpose would invade the jury's function [citation], and would invite circumvention of the rule that the risks and benefits of a challenged design

must be carefully balanced whenever the issue of design defect goes beyond the common experience of the product's users." (Emphasis omitted.) *Soule*, 8 Cal. 4th at 567, 882 P.2d at 308, 34 Cal. Rptr. 2d at 617.

■■ Illinois courts have not limited the use of the consumer expectation test to cases in which everyday experience alone led to the conclusion the design was unsafe. In *Besse v. Deere & Co.*, 237 Ill. App. 3d 497, 501 (1992), the court found that when the plaintiff alleged a design defect in a complex product, the court should usually evaluate the product's danger using a test that incorporates both the ordinary consumer's expectations and the risks and benefits of the product. There the court held:

"The two tests are not mutually exclusive and generally should be applied together except where the nature of the danger is particularly obvious and the mechanism itself is particularly simple." *Besse*, 237 Ill. App. 3d at 501.

At least in *Besse*, then, the court took a position that accorded with courts that have viewed evidence of a product's risks and benefits as admissible evidence of what a reasonable consumer should expect from the product.

The artificial hip here, and the D-M system implanted as part of the hip surgery, is not a particularly simple device. Consumers do not have an especially clear understanding of all the dangers inherent in the device or the level of safety they can reasonably expect from a product that performs the function of the D-M system. Thus the product appears to be one for which the court, following *Besse*, should apply an integrated test, incorporating both consumer expectations and risk-benefit analysis to determine whether the device is unreasonably dangerous.

Comment *k* to section 402A of the Restatement (Second) of Torts, adopted in Illinois in *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 36-37 (1980), provides further support for use of risk-benefit analysis for evaluating the danger of the medical device defendant made. According to comment *k*:

"*Unavoidably unsafe products*. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by

proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." (Emphasis omitted.) Restatement (Second) of Torts § 402A, Comment *k*, at 353-54 (1965).

Several courts have noted that the comment requires proof of negligence if the product qualifies as unavoidably dangerous. *E.g.*, *Rogers v. Miles Laboratories, Inc.*, 116 Wash. 2d 195, 207-08, 802 P.2d 1346, 1353 (1991). California courts have adopted a very broad interpretation of the comment, finding that strict liability does not apply to any pharmaceuticals or medical devices. *Artiglio v. Superior Court*, 22 Cal. App. 4th 1388, 1395, 27 Cal. Rptr. 2d 589, 592 (1994). Other jurisdictions, including Illinois, have required trial courts to determine on a case-by-case basis whether any medical device or other product qualifies as unavoidably dangerous. *Glassman v. Wyeth Laboratories, Inc.*, 238 Ill. App. 3d 533, 539 (1992); *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 781 (R.I. 1988); *Patten v. Lederle Laboratories*, 676 F. Supp. 233, 236 (D. Utah 1987).

The trial court here excluded evidence of the benefits and risks of the D-M system without considering whether the danger was avoidable. Defendant's offers of proof included evidence of the state of medical technology at the time it designed and marketed the product at issue. The offers of proof also included evidence of the risks inherent in other femoral fixation systems. Under comment *k*, the court should have decided whether the D-M system was unavoidably unsafe, and if it so qualified the court should have permitted defendant to present evidence that the product design cannot be considered unreasonably dangerous because its benefits outweighed its risks.

Thus, the court erroneously excluded evidence of the product's benefits and risks, which showed that the product was not unreasonably dangerous under the integrated test recommended in *Besse*. The

proffered evidence also had relevance to the defense under comment $k$, that this medical device was unavoidably dangerous. Therefore we reverse the judgment of the court and remand for retrial.

Comment $k$ requires a showing that the defendant gave appropriate warnings when it sold its unavoidably dangerous product. On remand, even though plaintiff has dropped the allegation of inadequate warnings, the court should permit defendant to prove that it supplied adequate warnings when it distributed the D-M system.

## IV. Class Action

### A. Standard of review

■ The parties agree to the phrasing of the general standard of review applicable to plaintiff's cross-appeal from the denial of his motion to certify this lawsuit as a class action. This court will not reverse the trial court's decision on such a motion unless the trial court abused its discretion or if the trial court applied impermissible legal criteria. *Gordon v. Boden*, 224 Ill. App. 3d 195, 199-200 (1991). But the parties disagree as to whether the court applied impermissible legal criteria. If the court did so, its decision appears to be subject to review without deference.

■ Section 2—801 of the Code of Civil Procedure establishes the appropriate legal criteria for class certification:

"An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:

(1) The class is so numerous that joinder of all members is impracticable.

(2) There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3) The representative parties will fairly and adequately protect the interest of the class.

(4) The class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2—801 (West 2000).

Plaintiff claims that several of the court's comments demonstrate application of impermissible legal criteria in the denial of the motion for class certification.

When the judge first stated his ruling on the motion, he commented, "It's a medical device," before proceeding to explain his findings on each of the four statutory criteria. The introductory comment does not demonstrate failure to apply the proper criteria.

In response to plaintiff's citations of mass disaster tort cases, the judge said, "I think they are completely different. I think it's a products case." The judge then held that the common questions in this case, unlike the cited mass disaster cases, did not predominate over individual issues. The comments show that the judge applied proper criteria. He observed, apparently correctly, that common questions are more likely to predominate in mass disaster cases because such cases do not involve separate questions regarding proximate cause. See *Morrissy v. Eli Lilly & Co.*, 76 Ill. App. 3d 753, 759 (1979).

The judge also rejected plaintiff's motion for an order to permit immediate appellate review of the denial of class certification. During the discussion the judge commented, "When you have product liability cases that concern medical devices I think that the courts are hesitant to move in that area." As comment *k* to section 402A shows, the judge's observation correctly reflects the law. While the observation may have had little bearing on the immediate question of whether to allow interlocutory appeal from denial of class certification, we cannot say that the comment proves that the judge applied improper criteria. Particularly because the judge gave reasons for his decision by explicit application of appropriate statutory criteria, we find no grounds to apply *de novo* review to the denial of class certification. We review the court's application of the statutory criteria for abuse of discretion.

## B. Predominance

█ The trial court found that the common question alleged in the complaint does not predominate over individual questions that would arise in determining the claims of other implantees injured by the D-M system. Plaintiff asserts that he need not show predominance because he sought class certification under section 2—802 of the Code of Civil Procedure. That section provides:

> "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." 735 ILCS 5/2—802(b) (West 2000).

Nothing in that section indicates an intention to exempt actions from the requirements of section 2—801. Section 2—801 specifies: "An action may be maintained as a class action *** only if the court finds *** [t]here are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members." 735 ILCS 5/2—801 (West 2000).

In support of his argument that we should ignore the plain language of section 2—801, plaintiff cites several cases interpreting Rule 23(c)(4)(A) of the Federal Rules of Civil Procedure. Much like section 2—802(b), that section simply provides: "When appropriate

*** an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. Proc. 23(c)(4)(A).

But the structure of the federal rule differs from the structure of the Illinois statute. Unlike the Illinois statute, the federal rule does not have a predominance requirement applicable to all class actions. Instead, the federal rule requires all plaintiffs to show only that the case involves questions of law or fact common to the proposed class; if the plaintiff meets this and other prerequisites for a class action, the lawsuit can qualify for class action status where plaintiff meets any one of the additional criteria named in Rule 23(b). Predominance of the common questions over individual questions is one such criterion, while the other criteria do not require the plaintiff to show predominance. Fed. R. Civ. Proc. 23(b).

Because the federal rule expressly allows for class actions in which common questions do not predominate over individual issues, the cited federal authorities do not persuade us to ignore the language of the Illinois statute. See *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). Even when a plaintiff seeks class certification under section 2—802(b), the plaintiff must show that the proposed class meets the requirements of section 2—801, including the requirement that the common questions predominate over the individual issues the court must address to resolve the claims of each of the individual class members.

Plaintiff also argues that the class questions will necessarily predominate over individual issues whenever the plaintiff requests certification under section 2—802(b), limited to class questions, because the court should not address any individual issues. The argument trivializes the predominance requirement of section 2—801. By simply choosing to limit the class action to common questions, the plaintiff in any proposed class action can always make the common questions predominant. Because plaintiff's interpretation of the statute makes the predominance requirement meaningless, we do not adopt the proposed interpretation. See *Northwest Airlines, Inc. v. Department of Revenue*, 295 Ill. App. 3d 889, 893 (1998). To maintain a class action in Illinois, the plaintiff must show that the particular common issues for which he seeks class certification under section 2—802(b) "predominate over any questions affecting only individual members." 735 ILCS 5/2—801 (West 2000).

In *Morrissy*, 76 Ill. App. 3d 753, the plaintiff sought to represent a class of the daughters of women who used Diethylstilbestrol (DES) during pregnancy. The proposed class action would determine whether DES could cause cancer. The trial court dismissed the action and the appellate court affirmed, finding numerous individual medical questions predominated over the proposed class question. *Morrissy*, 76 Ill. App. 3d at 761.

The trial court here similarly reasoned that the many individual issues would predominate over the common issue. The courts deciding the individual claims will need to resolve issues of whether the product caused injury. To determine the extent of each class member's recovery, the fact finder may need to make individualized determinations of the likely prognosis for each class member if the D-M system had not been implanted. Each court should consider the warnings defendant supplied to each surgeon and what information each surgeon conveyed to each class member. Each class member has a different medical history, and each faced different risks. The statute of limitations defense raised against this plaintiff has no bearing on other cases, and defendant may have valid limitations defenses against claims of several class members. The trial court did not abuse its discretion by concluding that plaintiff failed to establish predominance of the common question over individual issues.

## C. Efficiency

■ Section 2—801 provides that the court should not permit a lawsuit to proceed as a class action unless a class action is an "appropriate method for *** fair and efficient adjudication." 735 ILCS 5/2—801(4) (West 2000). Plaintiff claims that the limited class action would improve efficiency by establishing in one proceeding that the design made the D-M system unreasonably dangerous.

Plaintiff concedes that each individual claimant would need to prove that the defect caused his or her injury. But to do so each claimant would need to repeat much of the evidence presented in the class action concerning the alleged defect. And the issue of cause promises to be quite complex in each individual case. Presumably most implantees, like plaintiff, suffered from some medical condition requiring extensive surgery, often including replacement of bones and joints with artificial devices. To separate the preexisting conditions from the injuries caused by the defect, each trier of fact would need very detailed evidence of the design and its effect on the individual claimant. A separate class action for determination of whether the design was unreasonably dangerous would achieve little reduction in the evidence needed in each of the individual lawsuits.

In light of the holdings on predominance and efficiency, we cannot say that the trial court abused its discretion by denying the motion for class certification.

## VII. Motions in the Appellate Court

■ At oral argument on appeal plaintiff moved to correct his brief with a list of errata. We invited defendant to respond in writing.

Defendant objected to four items on the list on grounds that they changed the substance of the arguments. We now grant the motion to correct all items to which defendant does not object. Because we find that the other four errata do not affect our resolution of the appeal, we dismiss as moot the motion to add those four corrections. See *Styzinski v. United Security Life Insurance Co. of Illinois*, 332 Ill. App. 3d 417, 424-25 (2002).

Plaintiff subsequently moved to strike portions of defendant's brief concerning causation. Defendant filed a written response. Again, we find that the motion has no bearing on our resolution of the appeal, so we dismiss the motion as moot.

## VIII. Conclusion

Plaintiff presented sufficient evidence to support the jury's verdict that the design of the D-M system created a danger an ordinary consumer would not expect, and the design caused plaintiff to suffer endosteal lysis. The evidence also supports the jury's finding that plaintiff filed this lawsuit within the period permitted by the statute of limitations. We reject defendant's arguments that we should reshape the law of Illinois by focusing on the doctor's expectations for medical products, or by adopting the standards stated in the Restatement (Third) for medical products.

However, we find that the trial court should have applied a test integrating consumer expectations with risk-benefit evidence for determination of whether this complex, and perhaps unavoidably unsafe, medical device was unreasonably dangerous, especially because ordinary consumers would have little idea of how safe a device like the D-M system could be made. Under the integrated test the court should have admitted into evidence the testimony defendant offered on the risks and benefits of the D-M system. Accordingly, we reverse the judgment of the trial court and remand for retrial.

Because the trial judge considered all factors required by statute and did not rely on improper considerations, we reviewed the denial of class certification solely for abuse of discretion. The judge found plaintiff's proof of preponderance and efficiency unsatisfactory. We cannot say the judge abused his discretion, and therefore we affirm the denial of class certification.

Affirmed in part and reversed in part; cause remanded.

O'MALLEY, P.J., and McBRIDE, J., concur.